## Keystone Surgical Supply Company *v.* Bate.

*Contract — Preliminary dealings — Written contract—Evidence — Presumption.*

Where parties to an offer and acceptance show either by express words, or by their action that they regard the arrangement as preliminary only, and to be put into final shape thereafter, and subsequently they execute a formal instrument in writing, the latter is the only contract, and the preliminary steps, however elaborate, go into the category of mere negotiations leading up to the final result.    This is always the presumption of the law where a written contract is made.

Where a person submits the substance of an agreement to the directors of a corporation, and the directors notify the party of the acceptance of the proposal, and subsequently a written contract is executed embodying some provisions that were not in the proposal or the acceptance, the written contract will be presumed to be the real contract between the parties.

*Contract—Building contract—Dispossession of owner by contractor.*

A building contractor, even though the contract time for the delivery of the building had not arrived, has no authority to dispossess the owner of his premises, or to interfere with his possession further than is necessary to enable the contractor to complete his work ; and this is the case although the owner may have been guilty of a breach of a covenant in the contract.

Argued March 26, 1900.    Appeal, No. 35, Jan. T., 1900, by plaintiff from judgment of C. P. No. 1, Phila. Co., Dec. T., 1894, No. 119, on verdict for defendant in case of Keystone Surgical Supply Company, to use of William Rennyson, Assignee v. William T. Bate and Richard H. Bate, trading as W. T. Bate & Son.    Before GREEN, C. J., McCOLLUM, MITCHELL, BROWN and MESTREZAT, JJ.    Reversed.

Assumpsit for a breach of a contract before BEITLER, J.

The facts appear by the prior report of the case in 187 Pa. 460, and by the charge of the court which was in part as follows :

Richard H. Bate, the defendant here, was a stockholder in and a director of the Keystone Supply Manufacturing Company, in 1894.    He was appointed on a committee as a committee on building, or a committee on site and building, I am not certain which.    Mr. Yarnall did not seem to be certain whether there were two committees composed of the same

members on each, or whether there was one committee. At any rate, he was the chairman of the committe which was to report to the directors with regard to the construction of a building, and on February 23, 1894, as the chairman of that committee, he submitted a report.

Without going over all the testimony with regard to that, I think I may safely summarize it by saying that he reported several bids. The testimony is somewhat conflicting as to whether he reported three or four bids. He submitted plans and specifications drawn by an expert builder for a building of brick upon certain lots in Bridgeport. The lowest bid he reported was that of Mr. Martin, of Conshohocken, of $5,300. He offered to build the building for $5,500, and take payment in a mortgage. Mr. Martin wanted $5,300, in cash, and the other bidders predicated their bids upon cash in payment.

Now, Mr. Bate, as a director, had a duty upon him when he made that bid, higher than any duty that rested upon Mr. Martin, for instance, and the Supreme Court has said in regard to that duty: " This transaction comes under the common law rule, that all such transactions should be closely scrutinized, and it must be shown that the contract is in all respects fair and reasonable ; for the parties do not deal at arm's length —a certain degree of confidence and trust is necessarily reposed in the officer by this corporation ; his opinion, often, has great weight with his associates, and this gives him an advantage which he may use for his own interests, in disregard of his duty to the corporation. If it be true, as alleged, that Bate, being a director and member of the building committee, was intrusted, along with his associates, with the duty of procuring the erection of the buildings at the lowest price, then after ascertaining from Schoffner that it could be erected for less than $4,000, represented to the directors that it could not be built at actual cost for less than $5,500, and thus secured the contract for his firm at a profit of nearly $1,500, that was a fraud upon the corporation which warranted the rescission of the contract."

[That brings you, gentlemen, to the consideration of the first question of fact in this case, and to clear up any doubt I want to say to you that the contract between the corporation and Mr. Bate was concluded on February 23, 1894. It is true

that the written paper which evidenced that agreement then entered into was not signed until March 16, but you will recollect that that night the secretary was instructed to notify Bate & Son that their bid of $5,500 had been accepted, to be paid in a mortgage of $5,500, and that immediately thereafter a letter was sent to Bate & Son, notifying them that their tender was accepted. Thus, the two contracting minds came together, and the contract was perfected, and the rights of the parties date as of February 23, 1894.] [8]

If, at that time, Mr. Bate, as a director of that company and chairman of that committee, had in his possession knowledge of the fact that that building could be built for $3,940, or whatever Mr. Schoffner's bid was, and concealed that fact from his fellow directors, he did that which the Supreme Court in this case has said was a fraud.

Now, as to that I propose to call your attention to all the testimony that bears on it. If I make any mistake in failing to quote any testimony which Mr. Eyre thinks any of his witnesses gave, or if I fail to call your attention to any testimony that Mr. Holland gave, I will thank counsel if they will call my attention to it. I labor under the disadvantage of not having the report of yesterday's proceedings, which have not yet been written out.

Now, the first witness who referred to anything said by Mr. Bate, was Mr. Yarnall, and I will read from page 17 of the notes of testimony what he said in regard to it: "Q. Did Mr. Bate say anything to you at that meeting about whether the building was to be at cost or not? A. No, not to me. Q. What meeting was it? A. I can only say this: that Mr. Bate said at the meeting—not to be—. Q. What meeting? A. It was one of those meetings—that there was nothing in it to him, at all." As I recall it, that is all the testimony of Mr. Yarnall.

On page 30 of the testimony of Mr. Wilson, at the foot of the page, he was asked: "Q. What, if anything, did Mr. Bate say at directors' meetings prior to February 23, about what the building would cost? A. At the time the bids were submitted there were plans and specifications for this brick building. He said he had a bid on it from a builder named Martin, in Conshohocken, from $5,300 to $5,500. We were also recommended to go and look up prices of iron buildings, and I think Mr.

Pennington looked at them and he reported a price of about $6,000. I was asked to leave them in Bridgeport and go and get prices from Mr. Green, and Mr. Green reluctantly gave me a price of about $6,500 or $6,700. He said he would not make that as a price on plans and specifications left him by Mr. Pennington. By Mr. Holland: Q. What kind of building was that? A. Brick building. By Mr. Hannis: Q. $6,500 ? A. Yes, sir. By Mr. Eyre: Q. On the specifications Mr. Pennington had? A. Yes, sir. I didn't see the plans and specifications, but on what he had gone over with Mr. Pennington, and Mr. Bate said that he had this price from this builder Martin of $5,300 to $5,500, and that it would cost him about $50.00 for getting out the plans and specifications. Q. How much did he say it would cost him for the contract? A. He said the entire cost would be about $5,500. Q. What did he say as to how much it would cost him? (Objected to.) Q. What did he say? A. He said that on the plans and specifications as had been submitted there, he would build a building for $5,500; that he had a price from Mr. Martin of $5,300 to $5,500; that it would cost him about $50.00 for getting out the plans and specifications, and that $5,500 would just be about the cost of the building. Q. About when was that? You say prior to February 23. How long before February 23 ? A. I think that was on February 23, and I think on the strength of that report the secretary was authorized to notify the firm of William T. Bate & Son that we would accept the proposition. Q. Did he mention to you any bid of $4,000, or anything like it at that time ? A. No, sir; I never heard of such a price. Q. What was the lowest bid spoken of there ? A. $5,300. Q. Did he mention the name of Schoffner as a contractor to make a bid ? A. I never heard of Schoffner."

At the bottom of page 66, in the testimony of Mr. Slemmer, the witness was examined as follows: " Q. What bids did he report ? A. Well, there were several bids brought in there, but I didn't pay a great deal of attention to the bids, to tell you the truth, except the one of $5,500. Q. Why was it that that proposition was accepted? A. Because Mr. Bate said it was about the best. Q. On the strength of what representations, if any, made by Mr. Bate, did they accept that bid of $5,500 ? A. Simply because we were getting the full value; at least, I

did. Q. Who was it said you were going to get full value? A. Mr. Bate. He said it would cost him $5,500 to erect that building, and when that building was finished he would have to go in his pockets and pay the $5,500 in solid money, and he thought he was doing a great deal for the company. Q. He would have to pay it in solid money to whom? A. Why, to the contractors, as soon as the building was finished. Q. Did he at that time—or, in fact, at any other time—mention to you that there was a person by the name of Schoffner who was a contractor? A. No, sir. Q. For a bid of little less than $4,000? A. No, sir."

On page 89, Mr. Finney being questioned with regard to the same meeting and what Mr. Bate said, was asked: " Q. Did you hear Mr. Bate at any of the meetings before and up to February 23, say anything about what bids had been received? A. My recollection is that he spoke of three bids. At that time there was only about three days from the time we decided to build the mill at Bridgeport until the board of directors wanted to have the thing definitely settled. He spoke about three bids at that time. Q. And only three? A. Three only, as far as my recollection goes. Q. What were those bids? A. Well, the lowest, I think, was $5,300, and the highest something over $6,000. Q. He didn't say anything about the bid of Schoffner of $4,000? A. I never heard Schoffner's name mentioned at the meeting. Q. Did he say anything about what the cost would be? A. Cost to the company only. I never heard what it cost him. The understanding was that he was— Q. I mean the understanding as stated by him? A. That the building should cost him, or would cost him, what he was turning it over to the company for. Q. It wasn't to be at any profit to him? (Objected to; objection sustained.) Q. When did you first hear that the building had only cost $4,000? A. Well, that I can't recall."

Dr. Herman was the only other witness who referred to this matter, and Dr. Herman said: " Mr. Bate told me from the time the bid was mentioned — the $5,500 bid — until the contract was signed, and even after that, that he was doing all he possibly could for the company, and that I was to do my share, which I was doing, and, without a doubt, he knew it, that he

would have to pay the contractor, and he must raise $5,500 the day the building was completed, to do that."

Now, I say I have not the notes of Mr. Bate's testimony and Mr. Pennington's testimony, but I think I can remember it with tolerable accuracy.

The Court (continuing): Mr. Hannis desires me to read some more testimony of Dr. Herman's, which is this: "By Mr. Hannis. Q. And he wanted you to take more stock in the company? A. He wanted Tom, Dick and Harry as the case might be. Q. That is to say, he impressed on you what he was doing for the company, and that you and your friends ought to be doing more? A. Yes, sir; it was about that way. Q. All this talk, then, was for the purpose of inducing larger subscriptions for stock? A. Not at all times: sometimes he would casually make the remark."

Now, Mr. Bate, when called yesterday as a witness, testified flatly and positively that he never heard of Mr. Schoffner prior to February 23; that he submitted to the board of directors all the bids that he had; that the highest bid Mr. Pennington submitted, having received it from a firm on Sixteenth street or Seventeenth street, below Market, in Philadelphia; that after the fact became known through the papers that a building was to be erected for manufacturing purposes in the rather insignificant little place of Bridgeport, opposite Norristown, that then people came to see him, to solicit the privilege of submitting bids to him, and he then said to Mr. Schoffner, handing him plans and specifications, that he would be glad to have a bid from him; that Mr. Schoffner then submitted his bid, and that that was about March 9, and that he had first seen Mr. Schoffner two or three days before receiving the bid.

Mr. Schoffner, when called upon the stand, testified that he had submitted a bid to Mr. Bate in the latter part of February or early part of March. It is a pity that Mr. Schoffner had no means of designating what he meant by that more accurately, but you will have to decide in view of all the testimony in this case whether the latter part of February or the early part of March means before or after February 23.

Mr. Pennington says that he attended every meeting of the board of directors, and every meeting of the stockholders, and that he never heard Mr. Bate say at any of those meetings that

he was going to build this building at cost or say anything about any other bids, excepting those submitted.

[Now, gentlemen, that contract was finished on February 23, 1894. If, within a week of that time the cost of bricks had gone up twenty-five per cent or the cost of lumber ten per cent, and the cost of labor ten per cent, Mr. Bate would not have been in a position to demand from the company any increased cost in his contract price. He was bound by that contract, and so were they. If Mr. Bate took that bid, believing that he had to pay Martin $300, and his labor and supervision was worth $200, and, fortunately for him, found a bidder lower than Mr. Martin, he was not obliged to make known that fact to his company and give them the benefit of it. If down to the time that the contract was made everything was fair and open and above board between them, thereafter the rights of the parties were to be gauged and determined and measured by that contract.] [9]

Now, let us look at the other question in this case, and that is, did Mr. Bate dispossess the company?

Dispossessing a man means putting him out of possession. If, for instance, the foreman of your jury, having a house to rent, gives over the key to a man who wants to look at the house, and the man goes into that house and takes possession; that is to say, goes there and says, "I am going to hold this," that man has no legal possession. That man is in the occupancy of that house, but his possession is wrongful, and he is not there in possession of that house at all. The legal possession of that house is in the foreman of the jury. Or, take a case which we frequently see, that of a large building being constructed, in the hands and possession of the contractors, and a single room in that building fitted up for the use of the architect and his draughtsman. That possession is not the possession of the owner of the land and the man who is to have the building when he pays for it. That architect and his draughtsmen are in there simply permissively. They are there simply by the grace and good will of the contractor, and if there subsequently became a question as to whether the owner of the building had accepted the building from the contractor, no judge would say, and no injury would find, I take it, that the mere

permissive use of that room in that building was an acceptance of the building by the man for whom it was being constructed.

[Now, look at this case. There is no question at all that Mr. Pennington, one of the managers, or the chief manager of this concern, was, in point of fact, in this building in June, and perhaps many days in June and many days in July, perhaps continuously. If Mr. Bate had the right, under his contract, to give possession while Pennington was actually at work in the building, and if he did actually turn over that building to Pennington and the Keystone company, then the Keystone company was in possession. But, gentlemen, the presumption is that the man who was building it was in possession of it, and it would require affirmative evidence to show you that he parted with his possession. If he did, and if these people were in possession of that building under all the evidence in this case, then what the Supreme Court said applies to this case; and, that is, that Mr. Bate had no right to assert his right to recover possession by dispossessing these people; but if, in point of fact, they were there, as Mr. Pennington said, and perhaps some of the rest—I won't take the time to go over this testimony in detail—if they were there with a warning that they were there at their own risk; that what they were doing was at their own risk, and there was not, on the part of Mr. Bate, any turning over of the possession of that building to the Keystone Surgical Supply Manufacturing Company, then they could not be dispossessed because they were not in possession. That, however, is a question of fact for you to determine.] [10]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* among others (8–10) above instructions, quoting them.

*Lincoln L. Eyre* and *John G. Johnson*, for appellants.—Where the general terms of an understanding or contract preliminarily made are kept open from day to day, as has happened here, and certain new stipulations are agreed to, and radical changes made from time to time, until all the terms and details of the contract are finally embodied in a solemn writing under seal, the formal understanding must be merged into the subsequent and perfected one, and the contract must take effect as of the

date when the formal instrument is signed, sealed and delivered: Clark v. Great Northern Ry. Co., 81 Fed. Repr. 282; Thruston v. Thornton, 1 Cushing (Mass.), 89.

*James B. Holland,* with him *Thomas S. Williams* and *William C. Hannis,* for appellees—The contracts being in writing and the terms not disputed, it was for the court and not for the jury to say when they become binding on the parties: Davidson v. Lake Shore, etc., R. R. Co., 171 Pa. 522; Nugent v. Phila. Traction Co., 181 Pa. 160.

OPINION BY MR. JUSTICE MITCHELL, July, 11, 1900:

This case was unfortunately tried by the learned judge below on the erroneous theory that the contract between the parties was made on February 23, 1894. The facts were that at a meeting of the directors of the plaintiff company held on that day, a proposition was submitted by defendants embodying the substance of the agreement on the subject-matter concerned and that proposition was accepted by a vote of the directors. It may be conceded that the offer and acceptance amounted to a meeting of the minds of the parties and would be sufficient to constitute a contract between them if they so understood and intended. But where parties to an arrangement of this kind show either by express words or by their action that they regard it as preliminary only, and to be put into final shape thereafter, and subsequently execute a formal instrument in writing, the latter is the only contract, and the preliminary steps, however elaborate, go into the category of mere negotiations leading up to the final result. This is always the presumption of the law where a written contract is made, and in the present case it is rendered conclusive by the circumstances. The meeting by a separate resolution directed the secretary to notify the defendants of the acceptance of their proposal, showing knowledge that something more than the mere acceptance was necessary to complete the contract. Subsequently on March 16, the written contract was executed and it embodied some provisions that were not in the proposal or the acceptance, such as the agreement of the defendants to build according to the specifications submitted to and accepted by the plaintiff, and the stipulation by the plaintiff that the mortgage it was to give in payment should be a purchase money mortgage and payable in five years. These provisions it is

true are in harmony with the prior arrangement and are merely supplementary to it, but if they had been in any way in conflict they must have prevailed as the final agreement of the parties. On the undisputed evidence therefore the jury should have been instructed that the contract was the written instrument of March 16.

There was error also in the manner of submitting to the jury the question of possession. The plaintiff claimed to be the owner of the land, as having bought and paid for it, and the defendants were contractors for erecting a building upon it. If, therefore, plaintiff as owner was in peaceful possession, even though the contract time for delivery had not yet arrived, the contractor had no authority to dispossess it, or to interfere with the possession further than was necessary to enable him to complete his work, and a fortiori, none, if as appellant contends, the work was in fact completed a week before the dispossession took place. On this subject it was said by our brother DEAN in the former case 187 Pa. 460, 468, " But, it is argued, the company did not perform its contract with Bate & Son by a delivery or tender of the mortgage; admit it; but what right did that give building contractors to eject the owner from the peaceable possession of his own premises? A mere breach of covenant confers no such remedy on the wronged party and if the latter adopts it, he is liable to an action in damages." The question for the jury therefore on this branch of the case was simply the fact of plaintiff's possession, and the qualification that it was there with notice that what it was doing was at its own risk to which prominence was given in the charge, was wholly immaterial.

The charge and some of the answers to the points moreover are fairly open to the objection that they minimize the plaintiff's claim and tend to mislead the jury by treating the case as an ordinary action for contract price or on quantum meruit in which the discussion of fair profit and differences in payment by mortgage or in cash may be relevant. No doubt the learned judge was largely influenced by his view that the contract was complete on February 23, for confining the evidence to matters prior to that date, plaintiff's case was meager. But defendants are sued on the ground of fraudulent representations, and concealment of facts which good faith and their position of quasi

trust required them to disclose.  This is the main issue and it should be put before the jury with a full explanation of the law, and an open door to all evidence fairly bearing on the question.

Judgment reversed and venire de novo awarded.