Matter of ABC–FEDERAL OIL & BURN-
ER CO., Inc., Bankrupt.
Cause No. 25068.

United States District Court
E. D. Pennsylvania.
April 14, 1960.

Folz, Bard, Kamsler, Goodis & Greenfield, Goff & Rubin, Philadelphia, Pa., for trustees.

Cohen, Shapiro & Cohen, Philadelphia, Pa., for claimant.

LORD, District Judge.

This matter is before the court upon certificate of review, both sides having filed exceptions to the Referee's findings and opinion. The respective claims arise out of a series of transactions which can best be explained in terms of a history of the case.

### After Bankruptcy

Peltz Street Terminals, Inc., claimant, filed a proof of claim against the Bankrupt, ABC–Federal Oil & Burner Co., Inc., for damages for the breach of a contract for the storage ("thruputting") and blending of fuel oils for the Bankrupt at the Peltz Street Terminals in the City of Philadelphia.

The trustee in bankruptcy filed objections to the claim, on the ground that no contract was ever made. He also filed a counterclaim for the recovery of sums expended by the bankrupt in constructing a blending plant pursuant to the alleged or supposed contract which was never consummated. His position as to the counterclaim was that Peltz Street Terminals had been unjustly enriched by approximately $93,000, and further that the transfers involved in the counterclaim were in violation of Sections 67, sub. d and 70 of the Bankruptcy Act. The last-mentioned statutory sections (11 U.S.C.A. §§ 107 and 110) relate to liens and title to fraudulently transferred property of a bankrupt estate.

Hearings were held on the proof of claim and counterclaim before Referee Thomas J. Curtin, who filed an opinion and order December 8, 1959 (herein cited as Opinion) dismissing not only the claim of Peltz Street Terminals, Inc., but also the counterclaim of the trustee.

As to the claim of Peltz Street Terminals, Inc., Referee Curtin found that there was no contract, and therefore no basis for damages for breach of contract.

As to the counterclaim of the trustees for improvements to the Peltz Street Terminals, he said:

"* * * this clearly cannot be sustained, basically because of the lack of proof. As stated previously, the testimony of David Gilbert [Manager in name, but in fact completely controlled by Callis] is so full of inconsistencies and his dealings with his alter ego, Eugene M. Callis, so questionable that it is not worthy of belief.

"The Referee is clearly of the opinion that no knowledge of the real relationship between Gilbert and Callis was ever brought to the knowledge of Stanley Jacobs [principal stockholder of Peltz Street Terminals], he knew nothing of the financial machinations of the same two, acted in good faith when he advanced $250,000 for the purchase of the so-called Peltz Street Terminal, never was in any conspiracy to defraud.

"Accordingly, the trustees have failed to sustain their counterclaim." (Opinion, p. 6.)

The trustee, of course, has filed no exceptions to the Referee's holding that there was no contract. His contention is that the Referee's denial of the counterclaim cannot be reconciled with the holding that there was no contract. The trustee argues:

"If there was no contract, the property of the bankrupt transferred to the claimant purportedly pursuant to the nonexistent contract must necessarily remain the property of the bankrupt. To hold otherwise would be to confer an unjust enrichment upon claimant at the expense of the bankrupt's creditors.

* * *

"Furthermore, the Referee has ruled that the parties are *in pari delicto*. He has directly and by implication stated that the trustee does not have clean hands and is, therefore, not entitled to equity. Certainly, the evidence justified a finding that the claimant does not have clean hands and consequently does not deserve equitable relief. But to hold that the trustee is barred by the same wrongdoing is absurd.

"The trustee is the guardian of the bankrupt estate. He represents the innocent creditors whose money and property were misappropriated to the advantage of the claimant. If the Referee's reasoning is sound, then there could never be a recovery

by a trustee in a fraudulent transfer case. It is because trustees represent the creditors that the law will set aside in their favor fraudulent dealings between the bankrupt and third persons."

The trustee also takes issue with intimations in the Referee's opinion that the parties were *in pari delicto*. He also disagrees with the finding, quoted earlier herein, that Stanley Jacobs, principal stockholder of Peltz Street Terminals, was at all times free of guilty knowledge or intent.

Discussion of those contentions, however, is not possible without some recapitulation of the transactions which led up to the present dispute.

### Before Bankruptcy

Three companies are principally involved—(1) ABC–Federal Oil & Burner Co., Inc., the bankrupt; (2) Valley Oil Company; and (3) Peltz Street Terminals, Inc., the claimant.

The five persons principally involved in the dealings (apart from the trustee) are: Eugene M. Callis, Ethel W. Hurst, David Gilbert, Jack McSherry and Stanley B. Jacobs.

*ABC–Federal Oil & Burner Co., Inc.,* was the result of a combination of two companies—ABC and Federal, as its name implies. ABC Oil Company was originally both a partnership and a corporation. The corporation was dormant. The partnership was operated by two men—Bacal and Grabowsky. Federal Oil & Burner Co., Inc., was a corporation principally owned by two other men—Abrams and Henninger.

In February of 1956 Eugene Callis promoted the combination of those two companies to form ABC–Federal Oil & Burner Co., Inc., the bankrupt. At that time, Callis put David Gilbert into the position of nominal head of the newly formed corporation.

At about the same time, Callis interested Stanley B. Jacobs in the purchase of a barge oil terminal at Peltz Street and the Schuylkill River, Philadelphia, known as "Peltz Street Terminal" and owned by CFM Terminals, Inc. Jacobs thereupon organized a new corporation, Peltz Street Terminals, Inc. (the claimant) which bought out CFM Terminals, Inc., on August 4, 1956. Jacobs took 60% of the new corporation's stock. The other 40% went to one of the principal stockholders of CFM.

As a part of the transaction, the CFM wholesale oil business was turned over to Callis. Callis formed a company known as Valley Oil Company to handle this wholesale business. (N.T. p. 551.)[1] While the Valley Oil Company was registered in the name of Jack McSherry as a sole proprietorship, it was in fact a partnership in which Callis, McSherry, and one Ethel W. Hurst each owned one-third interests (N.T. p. 550).

The partners last named comprise three of the five persons previously listed as the principal actors (i. e. Callis, Hurst, Gilbert, McSherry and Jacobs). Of that five, all but Jacobs owed their participation to their previous associations with Eugene M. Callis. Callis had vast experience and knowledge in the oil business going back about 40 years (N.T. p. 532). Ethel W. Hurst had been his business associate for more than 20 years (N.T. p. 583). Jack McSherry was principally a salesman in the oil business and had also at one time worked for Callis.

The Referee's findings, after reciting the promotion of the merger by Callis, tells of the organization meeting on the 21st of February, 1956, at which (Opinion p. 2)

"* * * Gilbert became the executive Vice President and (p. 43) E. M. Callis was employed as a consultant to serve five years, ef-

---

1. The references to *N.T.* herein are to the notes of Testimony Sur Objections to Claim of Peltz Street Terminals, Inc. and Counter-Claim of Trustees, taken before Thomas J. Curtin, Esquire, Referee, from time to time and filed with the Clerk of this court on December 15, 1959 as Docket Entry No. 64 in the present cause, In Bankruptcy No. 25068.

fective January 1st, 1956, and at that same meeting a resolution was adopted authorizing the officers of the company to conclude whatever thruput contract deemed advisable for the storage of product at the Peltz Street Terminal (p. 43), and are Claimant's Exhibits 1-a, 1-e (12/15/58 hearing)."

The Referee further found, by Gilbert's own testimony, that Gilbert was recruited by Callis and that he was actually operating at the direction of Callis (Opinion, p. 3).

Mr. Jacobs told of the manner in which he was brought into the operation as follows:

"In 1956, the forepart of 1956, I met Mr. Callis. Mr. Callis was looking for office space for a company that was being organized and being merged. I had an available building and they looked at it and after some negotiations we came to a figure and rented it to ABC Federal." (N.T. p. 86)

As heretofore stated, the barge terminal corporation (Peltz Street Terminals, Inc.) was then organized by Mr. Jacobs—who became its principal stockholder—at the instance of Eugene Callis. The dealings of Mr. Jacobs were found to have been in good faith and without notice of any financial manipulation on the part of Gilbert and Callis (Opinion p. 6, quoted *supra*). He was without experience in the oil business, being primarily an investor in real estate. The trustee asserts in his brief that, in addition to directing Valley Oil and ABC–Federal,

"Callis was able to direct the operation of Peltz St. Terminals for the reason that Jacobs had many other interests and no experience in the oil business. He relied upon Callis from the beginning."

In seeking to visualize the connections between these parties, it seems helpful to note the testimony which showed that the Peltz Street Terminal's office, Valley Oil office, and Callis' office were all on the same floor at 2204 Walnut St. (N.T. p. 195). ABC–Federal's office was at 2210 Walnut St. (N.T. p. 195). Jacobs owns both properties (N.T. p. 196).

### The Respective Claims

The claimant asserted a claim in excess of $660,000 for 15 years' thruput profits and other damages. It was this claim which the referee disallowed for the reason that no contract had been proved.

The trustee counterclaimed for the cost of equipment delivered to the Terminal, aggregating over $93,000. More precisely, the items—as shown on Trustee's Exhibit No. 2 of February 11, 1959 —reflect improvements and equipment for the black oil plant and blender at Peltz Street Terminals for which bankrupt has paid cash of $52,224.45, and owes in addition the $32,202.41 listed on said Exhibit, plus an outstanding item of $9003 owed to Proportioneers. (N.T. p. 435.) Thus the disallowed counterclaim which is in question here amounts to $93,429.86.

### The Alleged Contract

The negotiations and proposals asserted to have formed a contract must be pieced together from over 600 pages of testimony and 32 exhibits. Involved are the interrelations of the three entities.

ABC–Federal was an oil distributor with both wholesale and retail customers. Valley Oil Company (Callis, Hurst and McSherry) came into the triumvirate through an agency agreement whereby ABC–Federal turned its entire wholesale business over to Valley Oil to be handled for the ABC–Federal account.

Peltz Street Terminal was in existence at the outset—being the barge oil terminal at Peltz Street and the Schuylkill River, Philadelphia, then operated by CFM Terminals, Inc. When Jacobs organized the new corporation, Peltz Street Terminals, Inc. (the claimant), the CFM wholesale oil business inured to it. That wholesale oil business was turned over to Callis, and by him to Valley Oil Company, which functioned pri-

marily to handle that business on the agency basis described.

A major part of the fuel oil in which ABC–Federal dealt was thruput at the Peltz Street Terminal. The trade term *thruput* describes an entire sequence of operations. To *thruput* is to bring the oil product to the terminal by river barge, to unload it into storage tanks, and to dispense it as needed into tank trucks which are brought in to load "under the fill". It was Callis, while acting on behalf of Jacobs (major stockholder of the claimant), who brought the ABC–Federal thruput business into the Peltz Street Terminal.

Contention has centered about a certain letter addressed to Jacobs by Gilbert as Executive Vice President and Treasurer of the bankrupt corporation, dated March 19, 1956 (Claimant's Exhibit C–2, 12/15/58). Claimant has variously argued that it was a complete contract, and again that it was an offer made by Bankrupt which was accepted by Claimant upon acquisition of the terminal. The following listing summarizes the provisions of that letter.

1. The bankrupt would enter into a 15 year lease for thruput of a minimum of 600,000 barrels of fuel oil at a specified charge per barrel.

2. The bankrupt would, at its own expense, erect at the terminal a 1,000,000 gallon tank at a cost of $30,000 and a blending plant at a cost of $75,000, plus or minus 10%.

3. By way of reimbursement, the bankrupt would be allowed a credit of $15,000 a year for five years, or a total of $75,000, against the thruput charges payable by the bankrupt under the 15 year thruput lease.

4. Jacobs would erect a one-story building at a cost of $75,000 to be leased to the bankrupt for 15 years at an annual rental of $12,000.

5. Jacobs would pay Callis 1¢ per barrel on all oil thruput under the 15 year thruput lease.

The Referee, in his opinion, took note of the fact that, according to the testimony of Jacobs, the

" * * * purchase price of the plant was to be $250,000 (p. 92), but that litigation held it up and in or around September 1st, 1956, the litigation was gotten out of the way and Peltz Street Terminal Corporation was organized (p. 93), and immediately thereafter the bankrupt started delivering materials on the Peltz Street premises for the construction of the black oil terminal (p. 96), that the 10,000 square feet building mentioned in the letter of March 19th, 1956, was never erected by Peltz Street (p. 97) * * *." (Opinion pp. 2, 3.)

These circumstances and others recounted in the Referee's opinion furnish ample basis for his conclusion that there was in fact no contract. Some of them are: that the building last mentioned was never erected; that when in November, 1956, Gilbert questioned Callis concerning the final contract he was advised—"Don't worry about it, the lawyers are working on it, it is being prepared." (Opinion, p. 3). The Referee adds:

"Walter Knecht, Esq., attorney for Callis and part-time attorney for ABC–Federal, testified (p. 464 et seq.) a formal agreement was never signed; that there eventually evolved an agreement, 'a copy of which I have with me. It is dated August 7th, 1956, although it was not prepared until sometime in January or February of 1957,' that it was never signed, that there were certain things lacking in there that ABC Federal wanted, that Peltz Street refused to sign a financing statement, that he knew about the Gilbert option executed to Callis for the $12,000 Goodman loan, knew that Callis was to have an option to purchase Peltz Street in the event that it was sold; that Trustees' Exhibit 4 represents the changes made in the second draft from that

of the first draft, that Trustees' Exhibit 3 represented a proposed form of lease, prepared by Mr. Callis and never signed; Trustees' Exhibit 2 was a copy of a proposed form of lease prepared by Sylvan Cohen, Esq. and forwarded to me (Mr. Knecht) with his letter of February 4th, 1957." (Opinion, p. 4.)

This Court is in complete agreement with Referee Curtin's statement in his discussion at page 6 of his opinion, in the light of the foregoing:

"The letter of March 19, 1956, and the testimony of Walter Knecht, Esq., clearly shows the parties contemplated the drawing of a formal thruput and blending plant agreement, but were never able to agree to terms and consequently no contract was entered into and the objection to the proof of claim must be sustained."

■ If the letter be viewed as an agreement to agree, it is not enforceable unless the parties have settled upon all essential terms. Onyx Oils & Resins, Inc. v. Moss, 1951, 367 Pa. 416, 420, 80 A.2d 815; Essner v. Shoemaker, 1958, 393 Pa. 422, 425, 143 A.2d 364; Upsal Street Realty Co. v. Rubin, 1937, 326 Pa. 327, 334, 192 A. 481, citing Williston on Contracts (Rev. ed.) Vol. 1, § 28.

Claimant has asserted that the terms embodied in the letter of March 19, 1956 comprised a complete, definitive agreement, relying on Emerman v. Baldwin, 1958, 186 Pa.Super. 561, 142 A.2d 440. The cited case involved a simple lease of a dwelling house. To say the least, this Court deems the case not controlling.

■ Another assertion—that there was an *oral contract*—is likewise untenable. It seems elementary that if an oral agreement could be found, it would be unenforceable by virtue of the Statutes of Frauds. That point will not be elaborated, however, since the claimant more recently prefers to press an assertion that the letter of March 19, 1956 was an *offer* which was accepted by Jacobs' subsequent conduct.

It is an understatement to say that the claimant is in an awkward position from which to argue "offer." For instance, Jacobs stated time and again that he considered the letter a binding contract. (N.T. pp. 98, 170–171). At the last-cited page, he even testified that he had obtained the opinion of counsel to the effect that the letter constituted a binding contract. (N.T. pp. 170–171.) In short, there is in the record no evidence to support the proposition that the letter was intended as an offer.

■ Furthermore, and apart from the inconsistencies last mentioned, the letter seems ineffective as an offer as a matter of law. In the first place, the terms of the letter are too vague and indefinite to amount to an offer. The very reasons which caused the Referee to find against sustaining the letter as an integrated contract—with which reasons the Court agrees—apply here to defeat its potentiality as an offer.

Secondly, if the letter were to be viewed as an offer, it was not accepted within a reasonable time. As the rule is stated in Section 40 of the Restatement of Contracts:

"The power to create a contract by acceptance of an offer terminates at the time specified in the offer, or, if no time is specified, at the end of a reasonable time * * *."

Jacobs did not acquire the terminal until August 7, 1956, some five months after the letter was signed by Gilbert.

Third, Jacobs never did unequivocally accept the alleged offer. His first response was to tell Gilbert that there was litigation pending as to the purchase of the terminal, and that he (Jacobs) could do nothing until that litigation was "cleaned up." (N.T. pp. 92–93).

■ It is necessary that acceptance be unequivocal in order to create a contract. Restatement of Contracts, Sec. 58; Jaxtheimer v. Borough of Sharpsville, 1913, 238 Pa. 42, 57, 85 A. 994; Sparks v. Pittsburgh Co., 1893, 159 Pa. 295, 302, 28 Pa. 152; Warner Bros. Theatres, Inc.

v. Profitt, 1938, 329 Pa. 316, 319, 198 A. 56.

A fourth obstacle to the offer theory is the subsequent conduct of the parties; it seems clear, for instance, that Jacobs did not regard the mere purchase of the terminal as acceptance. That is, when the litigation over CFM was ended and Jacobs took possession of the terminal, Sylvan Cohen, Esq., counsel for Peltz Street, and Walter E. Knecht, Jr., Esq., counsel for ABC–Federal, entered into extensive negotiations in an effort to conclude a contract—tacitly admitting that no contract was then in effect.

 Finally, there is an ultimate barrier to the argument that acquisition of the terminal amounted to an acceptance of the offer contained in the letter. The CFM terminal was not acquired until August, 1956. Therefore, assuming *arguendo* that the claimant's offer theory is correct, and that the terminal purchase was acceptance, that extension of claimant's argument would make the alleged contract date from August, 1956 rather than from March 19, 1956. See Keystone Surgical Supply Co. v. Bate, 1900, 196 Pa. 566, 574, 46 A. 887, and Newspaper Readers Service v. Canonsburg Pottery Co., 3 Cir., 1945, 146 F.2d 963, 965.

Jacobs admitted that he knew the financial condition of ABC–Federal in August, 1956 (N.T. p. 191). Thus, if there were no contract until August, 1956, it follows that Jacobs had personal knowledge of the financial predicament of ABC–Federal when the alleged contract was made.

The dilemma thus posed is fatal to the offer theory, regardless of which of its prongs one chooses. If acceptance was made by the CFM terminal purchase, it was made in the face of knowledge of ABC–Federal's insolvency, and is inconsistent with the Referee's finding of innocence and lack of collusion on the part of Jacobs. If the purchase was not an acceptance, the offer—for all that appears—remained open until bankruptcy intervened.

The Counterclaim of the Trustee

The Referee found that the counterclaim cannot be sustained, "basically because of lack of proof." In the passage quoted earlier, the opinion went on to find the testimony of Gilbert unsatisfactory. The exact statement was

" * * * this [counterclaim] clearly cannot be sustained, basically because of the lack of proof. As stated previously, the testimony of David Gilbert is so full of inconsistencies and his dealings with his alter ego, Eugene M. Callis, so questionable that it is not worthy of belief."

It is with regret that this Court must disagree with the learned Referee as to his ruling on the counterclaim. In doing so, however, this Court does not necessarily disagree with the Referee's view of the evidence, but simply believes that the counterclaim is governed by principles of law other than those applied by the learned Referee.

There does not seem to be disagreement as to the amount involved, i. e. $93,-429.86—being the improvements and equipment costs and obligations for the black oil plant and blender which was set up at Peltz Street Terminals on the authorization of Gilbert and Callis. That is—there is in existence such a plant, which has been affixed to the claimant's realty. It is likewise true that the bankrupt has no enforceable claim *under the incomplete contract* for recovery of the price of the plant. That is, the bankrupt's recovery, if any, must be in reliance upon equitable principles and not under the terms of the alleged contract.

Although the negotiations were never completed, there is ample evidence in the record as to the general sort of understanding which led to the erection of the plant. For instance, the letter of March 19, 1956, from Gilbert to Jacobs (Claimant's Exhibit C–2, 12/15/58) which has been set out in summary form above, provided in part that:

"2. The bankrupt would, at its own expense, erect at the terminal

a 1,000,000 gallon tank at a cost of $30,000 and a blending plant at a cost of $75,000, plus or minus 10%.

"3. By way of reimbursement, the bankrupt would be allowed a credit of $15,000 a year for five years, or a total of $75,000, against the thruput charges payable by the bankrupt under the 15 year thruput lease."

It must be conceded that the bankrupt cannot, as matters now stand, recover the expense of the plant (item 2) by means of the credits over 5 years described in the 3rd clause. The fact remains that the claimant has the improvements, and the bankrupt has nothing but receipted bills (and, in part, unpaid bills) to the total of over $93,000.

In such a posture, there would appear to be a case for restitution; that is, the trustee would have a claim cognizable in equity despite (or perhaps by virtue of) its unenforceability at law. This is the claim which was denied by the referee. In part, the stated ground was the implausibility of the witnesses for ABC–Federal, and in part that the parties were in pari delicto.

It is the view of this court that the principle controlling here is that

"A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution, Sec. 1.

Here, claimant has received a substantial benefit by the construction of the blending plant on its property at the expense of the bankrupt. The trustee here seeks to recover the value of the benefit so conferred. The following provision of the Restatement of Restitution, Section 53, appears applicable.

"(1) A person who has rendered service to another or service which inures to the other's benefit or who has affixed chattels to the land or has improved the chattels of another, is entitled to restitution therefor if the services were rendered, or the chattels affixed, or the improvements made:

* * * * * *

"(b) to obtain the performance of an agreement made with the other therefor, not operative as a contract, or voidable as a contract and avoided by the other party after the services were rendered, the transferor erroneously believing because of a mistake of law that the agreement bound the other * * *."

The illustration given by the Restatement to the foregoing Subsection (1), Clause (b), is:

"3. A and B enter into an agreement by which B is to perform services for A in return for which A is to transfer to B '10 acres of land', no land being specified. B performs the services. Since the agreement is too indefinite to operate as a contract by A, B is entitled to restitution for the value of his services."

In Walter v. Transue, 1901, 17 Pa. Super. 94, 99, the plaintiff was a tenant of real property under a five-year oral lease. After plaintiff had made improvements to the property, the defendant landlord evicted plaintiff because the lease was within the purview of the statute of frauds. The court stated that the plaintiff could recover the cost of his expenditures to improve the land.

Apart from exclusive concern with the equities of the trustee's position, it is well to look at the other side, and to consider whether the claimant is deserving of the Court's sympathy. The trustee insists that he is not, saying:

" * * * Jacobs never relied on the letter of March 19, 1956 as an arms' length honestly negotiated business transaction. He bought the terminal on the assumption that, through Callis, he could make a no-risk investment which would pay fraudulent profits of prodigious proportions. Jacobs admitted that there was no price advantage to ABC–Federal in thruputting at Peltz St. (N.T. 236–237). The same service could have been obtained at any number of other terminals. Yet, the bankrupt was to donate a

$30,000 tank to claimant and build a $75,000 plus blending plant at claimant's terminal, (Claimant was to repay the cost by thruput credits over a five-year period); the bankrupt was to have no written security interest in the blending equipment that it was to provide; it was to receive no interest or other yield on its advance of $75,000 plus for the blender, claimant was to receive an excellent return from the bankrupt as rent on the storage building to be erected by claimant, and Jacobs personally was to receive ⅔ of 1¢ for himself on each barrel of fuel oil thruput at the terminal by the bankrupt.

"Patently this transaction provided for the bankrupt no fair inducement to deal. It was nothing more than a devious scheme conceived by Jacobs and Callis to raid the treasury of the bankrupt for their mutual enrichment. Callis' share of the booty was $625 per month, plus his expenses from claimant, ⅓ of 1¢ per barrel for each barrel of fuel oil thruput by the bankrupt, an option to purchase Jacobs' interest in claimant, and the CFM wholesale oil business. Jacobs' share was the benefits to the terminal to be conferred by the bankrupt as outlined in the letter of March 19, 1956."

With this we agree.

### Conclusion

■ It follows from the foregoing discussion that the Referee's position that there was no contract will be affirmed. This Court, however, cannot agree with the Referee's denial of the counterclaim. It seems that to do so would be to confer an unjust enrichment upon the claimant at the expense of the bankrupt's creditors. In the view of this Court, accordingly, the trustee is entitled to the property transferred or the value thereof.

There are implications that some of the dealings made before bankruptcy by the ABC–Federal were not above reproach. It does not follow, however, that the trustee does not have clean hands and is, therefore, not entitled to equity.

■ The trustee is the guardian of the bankrupt estate. He represents the innocent creditors whose money and property were appropriated to the advantage of the claimant. Neither wrong doing on the part of the management of ABC–Federal, nor overreaching on the part of the claimant, is to be allowed to defeat the rights of the creditors or—on the other hand—to permit the claimant to be unjustly enriched.

For the foregoing reasons, it is hereby ordered that the exceptions of claimant Peltz Street Terminals, Inc., to the Referee's disallowance of its claim are denied.

It is further ordered that the exceptions of the trustee to the Referee's disallowance of the counterclaim of the trustee are sustained. It is therefore the ruling of this Court that the trustee shall recover from the claimant the sum of $93,429.86 and it is so ordered.