## Lewis v. King

*William A. Bevevino,* of *Swanson, Bevevino & Millin, P.C.,* for plaintiff.

*H. Robert Hampson,* of *Hampson & Hampson,* for defendant.

WOLFE, *P.J.,* October 23, 1978—Defendant has demurred and filed a motion for more specific pleading on the cause of action declared by plaintiff in assumpsit. The demurrer is directed to a writing between the parties which defendant claims is against public policy, is criminal and tortious and

unenforceable as a breach of promise to marry pursuant to the Act of June 22, 1935, P.L. 450, sec. 1 et seq., 48 P.S. §171.

In considering a demurrer we are compelled to accept as true all well pleaded facts and the fair inferences therefrom, but not conclusions of law or unjustified inferences. The question to be decided upon the facts averred in the complaint is whether it shows with certainty the law will not permit a recovery. Where a doubt exists as to whether or not summary judgment should be entered it should be resolved in refusing to enter it. In Borden v. Baldwin, 444 Pa. 577, 582, 281 A. 2d 892 (1971), the court stated:

"It is well established that preliminary objections admit as true all facts that are well and clearly pleaded, but not the pleader's conclusions therefrom or averments of law: Gardner v. Allegheny County, 382 Pa. 88, 94, 114 A. 2d 491 (1955); Narehood v. Pearson, 374 Pa. 299, 302, 96 A. 2d 895 (1953). In Catanese v. Scirica, 437 Pa. 519, 521, 263 A. 2d 372 (1970), this court reiterated with approval the rule that ''''In determining whether or not [a summary] judgment should be or should have been entered [on a demurrer], two rules must always be applied: (1) The question to be decided is not whether the statement of claim is so clear in both form and specification as to entitle plaintiff to proceed to trial without amending it, but whether, upon the facts averred, it shows with certainty that the law will not permit a recovery by the plaintiff; and (2) Where a doubt exists as to whether or not summary judgment should be entered, this should be resolved in favor of refusing to enter it.'''''"

Another guideline we are compelled to follow in treating a demurrer is the holding of Schacter v. Albert, 212 Pa. Superior Ct. 58, 239 A. 2d 841 (1968), stating at 62:

"'It is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts, what the intention of the parties was as shown by the facts. . . . Under such circumstances the case is not one to be decided by the Trial Judge on a motion for summary judgment.' S. J. Groves & Sons Company v. Ohio Turnpike Commission, 315 F. 2d 235, 237, 238 (C.A. 6th Cir.), cert. denied, 375 U.S. 824, 84 S. Ct. 65, 11 L.Ed. 2d 57 (1963)."

The cause of action declared upon is in three counts. The first count claims an aggregate amount of $188,974 based upon an alleged written contract wherein defendant agreed to convey property to himself and plaintiff jointly if she would take care of him and help him with his home and business. The second count is founded on an alleged oral statement made by defendant to plaintiff that if she moved from California to Pennsylvania, for all of the "services, help and assistance which she had rendered to him" defendant would pay her $35,000. The third count is for a stated amount of $188,974 for damages allegedly incurred by plaintiff when she was induced by defendant to move from her home in California to Pennsylvania on false and fraudulent statements that if she would do so defendant would "transfer to her one-half of all of his assets whether real, personal or mixed and he would marry her when he was in a position to do so." Both in count one and count two the allegation

is made that defendant would name plaintiff as the beneficiary on certain insurance policies and a retirement plan. Count one additionally alleges defendant would make a new will leaving his entire estate to plaintiff, "and that when he was free to do so that he would marry the plaintiff."

Count one of the cause stems from an instrument captioned "Article of Agreement" obviously drafted by a layman and executed by the parties as follows:

"KING LUMBER & SUPPLY COMPANY
COMPLETE LINE OF BUILDING MATERIALS
TIDIOUTE, PENNA.

ARTICLE OF AGREEMENT

Made the 6th of October, 1975 between James P. King, King St. King Lumber, Tidioute, Pa., Party of the first part; and Beverly L. Lewis Box 104, La Canada, Calif. 91011 or King St., Tidioute, Pa., Party of the second part.

James P. King agrees to the following, as long as Beverly Lewis lives with him, takes care of him, and helps with the home and business. Beverly Lewis agreed to the following, also.

1. The following assets will be treated as joint property. From King Lumber.

   a. Inventory

   b. Accounts Receivable

   c. Cash on hand

   d. All equipment, tools, and vehicles

   e. Jim's half of the real estate

   f. All interest accounts (except Jennifer's college fund), checking accounts, stocks and bonds, and mortgages.

   g. The camp on Tidioute Water Co. land

   h. The 1975 Ford car

i. Jim's half of 6 river lots and seven acres on McGuire Run

2. James P. King has already made Beverly Lewis the beneficiary for the Nationwide Insurance Policy, G. I. endowment insurance policy and his T. Rowe Price retirement fund. These will not be changed as long as Beverly is living with Jim.

3. James King will make a new will, reserving the required one-third for Helen King. The balance will go to Beverly Lewis. The day that Helen and James King's divorce is final, a new will will go into effect stating that all of Jim's estate will go to Beverly in the event of his death, with second beneficiaries the 8 children of Jim and Beverly.

4. The assets that Beverly Lewis brings from her California home will also be treated as joint property with James King as soon as we are married.

5. The mortgage from the old King Lumber Co. office, United Accumulated Fund, stocks and bonds are intended as Helen's share to obtain a divorce from her. As soon as any or all of these funds are needed, Beverly will release her half for this purpose.

6. Any inheritances received by Jim or Beverly will be treated as joint property.

7. Beverly may take vacations to Calif. to visit her children at any time she feels the need with no interference from Jim, limited to 2-3 weeks, not more than 4 times a year. (Except illness, emerg. etc.)

8. Any children over 21 years of age will not live with us, except during vacations.

9. Beverly's two children, Ron and Kathy, may live with us until they are out of high school, if they so desire.

10. If Beverly decides to leave, after a period of

five years from this date, Jim will guarantee Beverly $35,000 as a settlement. Part of this would be monies that Beverly has already accumulated. Jim would make up the difference. This agreement holds if they are not married or married but would not be a final settlement if they are married.

11. It is the intention of James King and Beverly Lewis to get married as soon as they are both free to do so. At this time, all assets will become joint property. From then on, the eight children of James P. King and Beverly L. Lewis will be treated as equals in financial affairs.

s/James P. King
James P. King

s/Beverly L. Lewis
Beverly L. Lewis

s/Nancy C. Schwab
     Witness

s/Robert E. Schwab
     Witness

(Notarized)"

It is now settled that the court, in interpreting a contract, must ascertain the intention of the parties and the intended effect be given to all of the provisions of the contract. The intention of the parties is the writing itself and when the words are clear and unambiguous the intent is to be determined only from the expressed language of the agreement. "'When a written contract is clear and unequivocal its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the

intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.'" R. F. Felte, Inc. v. White et al., 451 Pa. 137, 302 A. 2d 347 (1973).

Reading the instrument in its entirety to glean the intent of the parties, we believe, for the most part, except for paragraph 2, the contract is executory in nature. Paragraph 11 appears to be clear and unambiguous in that the agreement was to be executed when the parties married. "At this time, all assets will become joint property." Paragraph 1 is supportive of this intention as it uses the words "will be." Paragraph 3 uses the language "will make a new will." Paragraph 4 makes reference to plaintiff's property, "will also be treated as joint property . . . as soon as we are married." Paragraph 6 refers to language, "will be treated as joint property."

The complaint does not allege the parties are married. We believe a fair interpretation of all of the language used is that the transfer of the parties' property was to be made to them jointly at the time of their marriage. In Miller v. Reading Hotel Company, 248 Pa. 541, 94 Atl. 225 (1915), a non-suit was entered because a condition precedent had not been performed. Plaintiff, in the instant case, does allege she has conformed and complied with all conditions to the extent that it was possible except where she has been prevented from doing so by defendant's conduct. Nonetheless, there is no allegation she has married defendant or she and defendant were capable of a legal ceremony. The language of the agreement leaves no doubt defendant is a married man and was contemplating divorce. In our view the facts, as averred, show with certainty that the law will not permit recovery as the complaint does not aver that the condition prece-

dent, to wit, marriage, has been consummated as the condition precedent for the performance of the obligation of defendant.

Turning to the second count, paragraph 8 alleges, "that on or about May 22, 1978, defendant orally stated to plaintiff that for all of the services, help and assistance which she *had rendered* to him that he would pay her the sum of $35,000 and that he would pay her that amount even if she moved from the town of Tidioute, Pennsylvania." (Emphasis supplied.) Plaintiff alleges defendant has failed to pay the stated amount and therefore seeks relief in monetary damages. In our opinion the demurrer under this count must be denied as a fair reading and the inferences deduced therefrom make it at least actionable that plaintiff has performed past services for defendant for which she has not been compensated as agreed. At this posture of the case we believe it to be actionable and will deny the demurrer.

Count three alleges, in essence, in the month of June, 1974, defendant falsely and fraudulently represented to plaintiff he would transfer one-half of all of his assets to her and marry her when he was in a position to do so if plaintiff would move from her home in California to Pennsylvania and he would also name her as the beneficiary to his insurance policies; that plaintiff was so induced to move to Pennsylvania and did so but defendant has failed to perform his term of the agreement and has refused to marry her. The only discernible difference between count one and count three is that count one is grounded in a written agreement whereas count three alleges what is a cause of action in fraud in inducing another person to perform to the latter's detriment. Although we have difficulty in concluding this count is actionable as it appears on its face

to be preliminary negotiations entered into in June, 1974, which were consummated in the written agreement of October 6, 1975, and thereby merged therein, nonetheless, in the face of the allegations of fraud and the alleged reliance thereon, a summary dismissal of the count at this stage would be improper. It is now established as stated in Keystone Surgical Supply Co. v. Bate, 196 Pa. 566, 574, 46 Atl. 887 (1900), "when parties to an [offer and acceptance] show either by express words or by their action that they regard the arrangement as preliminary only, and to be put into final shape thereafter, and subsequently execute a formal instrument in writing, the latter is the only contract, and the preliminary steps, however elaborate, go into the category of mere negotiations leading up to the final result." Nonetheless, as we are compelled to do, "we are to accept as true all well pleaded facts of the nonmoving parties' pleadings, . . . giving to them the benefit of all reasonable inferences to be drawn therefrom; the record must be examined in the light most favorable to them; and in passing upon a motion for summary judgment, it is no part of our function to decide issues of fact but solely to determine whether there is an issue of fact to be tried and all doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment." Ritmanich v. Jonnel Enterprises, Inc., 219 Pa. Superior Ct. 198, 203, 280 A. 2d 570 (1971).

We therefore conclude that we may not supply facts to count three or conclude as a matter of law the allegations of count three have been consummated in the instrument of October 6, 1975.

Defendant argues the entire complaint is not actionable because it is against public policy and is an obvious action for breach of contract to marry

which actions have been abolished by the Act of 1935, supra. As stated, we have no difficulty in concluding the instrument of October 6, 1975, contemplated marriage. We agree with plaintiff any breach of a contract which is not the actual contract for marriage, "no matter how closely associated with the proposed marriage" is actionable: Pavlicic v. Vogtsberger, 390 Pa. 502, 136 A. 2d 127 (1957). The agreement mandated that plaintiff live with defendant, care for him and help him with his home and business, which she alleges that she did. To this, defendant says plaintiff entered into conduct contrary to public policy and morality. Of course adultery has been removed from the Crimes Code effective June 6, 1973, and is no longer criminal conduct. The broad view is that the fact parties agree to maintain illicit sexual relations does not render the agreement illegal:

"It is true that the existence of the relationship must excite the scrutiny of the court called to inquire into the validity of the agreement. If the character of the agreement is such as would naturally spring from the relationship and is not such as would be expected if it were founded on a valuable consideration moving between the parties, as if they were strangers dealing with each other, clear and convincing proof of the consideration must be given to neutralize the unfavorable inferences the court would feel constrained to draw. But immoral as their conduct may be, there is no legal inhibition against their making agreements with each other; and if their agreement is not infected by the illegality of a relationship, and is supported by sufficient consideration it will be upheld and enforced." 17 Am.Jur. 2d, Contracts, §184, at 550.

In other jurisdictions express agreements have

been held valid for services to be rendered by a woman for a man as housekeeper and servant although the parties entering into it lived together in a state of concubinage during the time the services are being rendered, unless the agreement was made in contemplation of such illicit relationship. "Where the claim for compensation is based on an agreement and grows out of the lawful services actually rendered, and no part thereof has reference to the meretricious relationship existing between the parties, the claim is enforceable." Emmerson v. Botkin, 26 Okla. 218, 109 Pac. 531. To the same effect is McClelland v. Cowden, 175 F. 2d 601 (C.A. 5th Cir. 1949), holding that although a woman may not recover for property promised by defendant because of the statute of frauds or impress a trust upon the property, this does not mean that "because she lives in an immoral relationship [she] cannot recover for property purchased by her services and effects (citations omitted) or for the value of services rendered by her for which she can sue without relying upon the illegal agreement. . . ."

The status of the law concerning contracts of immorality as against public policy appears to be if the consideration for the contract is primarily sexual immorality or moral turpitude it will not be enforceable; however, if there is independent consideration for services rendered by a woman the agreement is enforceable:

"A woman who knowingly and voluntarily lives illicitly with a man cannot recover on an implied contract for payment for services, such as those of housekeeper, rendered him during such relationship; nor is a recovery permitted on an express agreement to pay for such services, if the contract was made in contemplation of the illicit relation-

ship, or the services for which the compensation is claimed were incidental to the meretricious relationship existing between the parties.

"However, the mere fact that the parties to the contract are maintaining illicit sexual relations does not render the contract illegal, so that, where the illicit intercourse does not enter into the consideration for the contract, a contract is not invalidated by the fact that the parties sustain unlawful relations, as for example, an express agreement for the disposition or division of property and earnings. So, also, an express contract for payment for services as housekeeper may be sustained where the illicit relations do not for any part of the contract and no part thereof depends on or has reference thereto." 17 C.J.S. Contracts, section 266.

A review of the entire instrument executed by the parties does not, in our opinion, establish that the consideration was solely or primarily based upon their agreement to live together illicitly. Plaintiff agreed to help defendant with the home and business as well as live with him and care for him. The agreement far outreaches a mere cohabitation between the parties for the purpose of sexual relations or in the lifestyle of husband and wife.

We cannot conclude as a pure matter of law this count is not actionable at this stage of the proceedings. Plaintiff must be given an opportunity to prove her claim if she can, to wit, the lack of merger of any preliminary negotiations with the agreement of October 6, 1975, and the existence of independent consideration to bind the contract.

Finally, resolving the motion for more specific pleading, defendant requests plaintiff to specifically plead the manner in which the damages claimed are computed. This request is based upon the allegation of fraud as pleaded in count three. We

recognize the damages claimed in count three and count one are the same and have addressed the issue of the alleged oral inducement, possibly finding finality in the October 6, 1975, agreement. The amount of damages claimed is a burden on plaintiff to prove by a fair preponderence of the evidence and this of course would apply to the alleged value of defendant's property to be determined at trial. Suffice it to say defendant does not need any specificity concerning the damages at this time to file a responsive pleading.

For the foregoing reasons we enter the following

### ORDER

And now, October 23, 1978, the demurrer to count one is granted.

The demurrer to count two is denied.

The demurrer to count three is denied.

The motion for more specific complaint for damages is denied.

Defendant is granted 20 days to file a responsive pleading from the filing date of the within order.