WILLIAM O. FROTHINGHAM *vs.* FRANK F. WOODSIDE.

Oxford.    Opinion May 15, 1923.

*The opinion of the sitting Justice upon a petition under R. S., Chap. 7, Secs. 87 to*
*91 inclusive, seeking to oust the Sheriff for the County of Oxford to*
*whom a certificate of election had been issued, in the main*
*adopted.*

The rules established in this State as to what shall be deemed a distinguishing
   mark such as to invalidate a ballot have undergone much liberalization in order
   that the honest intent of the voter may not be thwarted.

A ballot should not be rejected on the ground of fraudulent marking when its
   appearance is consistent with any honest action or intention of the voter.    The
   burden to show fraud is on the one who claims it.    Doubts should be resolved
   in favor of the voter, unless the fraudulent purpose clearly appears.

Yet marks of every sort and character cannot be allowed.    If so, the secrecy of
   the Australian ballot and the avoidance of bribery at elections sought to be
   secured thereby would be circumvented.

On appeal.    This is a petition under R. S., Chap. 7, Secs. 87 to 91
inclusive to oust the Sheriff for the County of Oxford elected at the
State election held on September 11, 1922.    The returns, as counted
by the Governor and Council, gave the respondent 5,002 votes; the
petitioner 4,990; and scattering 2.    A certificate of election was
issued to respondent, whereupon a petition was duly filed to determine
the election of sheriff, on which petition a hearing was had by the
Chief Justice, from whose decision in favor of the petitioner, an
appeal was taken to the Law Court in accordance with the statute.
Appeal dismissed with costs.

   The case is stated in the opinion.

   *Matthew McCarthy*, for petitioner.

   *Hastings & Son and Frederick R. Dyer*, for respondent.

SITTING:  SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, WILSON,
   DEASY, JJ.

   MORRILL, J., dissenting.    WILSON, J., concurring in dissenting
opinion.

SPEAR, J.   At the State election held on the second Monday of September, 1922, in Oxford County, Frank F. Woodside was the regular party nominee for sheriff on the Republican ballot and William O. Frothingham, the regular party nominee on the Democratic ballot, for the same office.   The returns, as counted by the Governor and Council, gave Woodside 5,002 votes; Frothingham, 4,990; and scattering, 2.   A certificate of election was issued to Woodside; whereupon a petition was filed in due time by Frothingham to determine the election of sheriff, which, upon due notice, was heard by Chief Justice CORNISH, and from his decision in favor of the petitioner, an appeal was taken, in accordance with the statute, to the Law Court.   The decision of the case depends upon the construction of the Public Laws of 1917, Chapters 306 and 296, approved on the same date.   If these statutes are to be construed together, as declared by the Chief Justice, then there is no question but that the petitioner had a plurality of the legally cast ballots; and vice versa if they are not to be construed together.

Inasmuch as the opinion of the Chief Justice embraces a full and clear analysis of his interpretation of the statutes referred to, as well as an illuminating discussion of the legal and illegal methods employed by the voters in exercising the franchise under the present statute, we substantially adopt his opinion as the opinion of the court, modifying it only in those particulars in which the court differs with his findings.

The opinion is as follows:

"This is a petition under R. S., Chapter 7, sections 87 to 91 inclusive, to determine the election of Sheriff for the County of Oxford at the State election held on September 11, 1922.   The certificate of election was issued to the respondent.   The petitioner seeks to oust him from office.

"I.   ADMISSIONS.

"It is agreed between the parties and counsel as follows:

"1.   That the total number of ballots cast, concerning which there is no contest, is...................................................................... 9955

"2.   That of this number

"Frank F. Woodside, respondent, received......................... 4987

"William O. Frothingham, petitioner, received.................... 4968

"3.   That the number of contested ballots was orginally          94
which formed themselves into nine groups.

"4.   That group 1, consisting of 10 ballots, after further inspection
by counsel should not be counted for either candidate.   This group
is therefore eliminated, leaving the total number of disputed
ballots...... .... . .. .. ... . ... . ........ . .... ..... ....... . . ....... .. .............          84

"II.   I will consider these contested ballots by groups, as follows:

"Group 2.                                                  Total 7.

"These ballots show a cross in the Republican party square.   The
name of Frank F. Woodside is not erased.   The name of William O.
Frothingham is written in the blank space below Woodside's name
and a cross is placed in the small square opposite the name so written
in.

"I do not count these ballots for either candidate.   .   .   ,.   .   As
they stand these ballots disclose an attempt to mark two names for
one office.   This cannot be done.   R. S., Chap. 7, Sec. 20.   These
ballots are therefore rejected.

"Group 3.                                                  Total 16.

"No cross in either party square, but crosses made against
individual names, mostly in the Republican column.   Woodside's
name erased.   Frothingham's name written in in the blank space
below Woodside's and a cross placed in the square opposite Frothing-
ham's name so written in.   Frothingham's name not crossed in the
Democratic column.

"This raises a novel question of law.   The respondent contends
that these ballots should be rejected; that they cannot be counted
for Frothingham because his name was printed on the ballot in another
party column, and the only way in which a Republican voter could
vote for Frothingham would be by erasing Woodside's name in the
Republican column and placing a cross against Frothingham's name
in the Democratic column.

"The statute provides two methods of voting, first, the group
method by placing a cross in the party square and thereby including
the names of all the candidates of that party printed below in the
party column, unless some of them are erased; second, the voter may
omit the cross in the party square and then the words are: 'and
place a cross in the blank square at the right of the name of each
candidate he wishes to vote for.'   P. L. 1917, Chap. 306.

"In this group 3, the voters employed the individual method and they placed a cross against the names they wished to vote for, including the name of Frothingham written in under Woodside's. But the respondent contends that the necessity of crossing the printed name if it appears in another column is to be inferred from the next sentence of the same section which is: 'If the voter wished to vote for a candidate whose name is not on the ballot he may write the name under the name of the candidate erased.' It is argued from this that the name can only be written in when it does not appear in another column. If this is the true construction of Chapter 306, or if there is doubt as to its true interpretation, that doubt is cleared by the provisions of Chapter 296 of the Public Laws of 1917, approved on the same date as Chapter 306, April 7, 1917, and therefore the two statutes are to be construed together.

"Chapter 296, amending the provision as to the preparation of ballots, after reenacting the clause as to the blank space below the names 'in which the voter may write the name of any person for whom he desires to vote as a candidate for such office,' adds these significant words which had not appeared before: 'At the right of each name and at the right of the blank space above provided for there shall be left a blank square in which the voter may make a mark.' For what purpose is the voter allowed to place his cross in this blank unless his ballot so marked is to be counted? The Ballot in its amended form is an express invitation to insert any name below the name of the candidate erased and to cross it after it is written in. That invitation was accepted by the voters in this group under consideration. These two statutes so construed give the voter under such circumstances the option either of crossing the name in another party column, or of writing it in the blank space below the erased name and crossing it. Such would seem to be the ordinary and usual interpretation of the language.

"True, one act is numbered 296, and the other bears a later number, 306. But that is immaterial. The numbering of legislative statutes is a ministerial and not a legislative act, and, nothing appearing to the contrary, statutes approved on the same day are presumed to have been approved contemporaneously. *Harrington* v. *Harrington*, 53, Vt.; 649; *Stuart* v. *Chapman*, 104 Maine, 17.

"Nor does the fact that Chapter 296 took effect in ninety days after adjournment, and Chapter 306 by its terms not until January 1,

1918, affect the situation. The reasoning of the court in *Stuart* v. *Chapman*, supra, applies here with equal force. It is absurd to suppose that the Legislature intended the amendment provided for in Chapter 296 to have effect only from July 6, 1917, to January 1, 1918, and then to be repealed instanter by Chapter 306, approved on the same day. It would have been simpler, if that was their intention, to withdraw the bill which afterwards was numbered 296, and pass the bill which became Chapter 306, especially as no State election intervened.

"Nor is there any force in the clause in Chapter 306, repealing acts and parts of acts inconsistent therewith. Even if this could apply to a bill approved on the same day, there was no inconsistency between these two acts. They simply gave the voter two methods instead of one, and if any reasonable doubt exists such doubt should be resolved against disfranchising honest voters.

"Considering therefore these amendments together, I think the statute authorizes the counting of this group for the petitioner, Frothingham.

"Group 4,                           Total 10.

"Cross in Republican party square. Woodside's name stricken out. Frothingham's name written in blank space beneath Woodside's name and crossed in the blank space opposite Frothingham's name so written in.

"This involves a similar situation to that in Group 3, the difference being that here the voters employed the party group instead of individual method of voting.

"The respondent relies upon the following provision of Chapter 306, P. L. 1917, as prohibiting the counting of these ballots: 'If the voter shall desire to vote for any person or persons whose name or names are not printed as candidates in such party group or ticket he may erase any name or names which are printed therein and place a cross (X) in the square at the right of the name of the candidate of his choice in any other party group or ticket.' The contention is that this is an exclusive method and if in voting by the group method the voter wishes to vote for a candidate of another party, he must cross the name of that candidate in its party column.

"Granting that a strict interpretation would lead to that conclusion, yet here again we bring in Chapter 296 of the same legislature, approved on the same day, and for the reasons given under Group 3,

construing the acts together, the method used by the voters here was authorized. Two methods were allowed and they selected one of them.

"These ballots I count for Frothingham.

"Group 5.          Total 19.

"Cross in Republican square. Woodside's name stricken out. Frothingham's name written in in blank space under Woodside's in Republican column. No cross in small square at right of Frothingham's written in name.

"This goes one step further and raises the question whether where the party group method is employed, the written in name may be counted without being crossed; whether, in other words, the written in name is substituted for the printed name, has all the rights that the printed name has, and the party cross at the top covers and carries with it all the names in that group below whether party candidates or not. There is perhaps some plausibility for such a construction as would compel the voter employing the individual method to mark the substituted name as he marks all others, and would not compel the voter employing the group method to mark the substituted name any more than he marks the others. But the party group method of voting is based upon the fact that all the names in the party column are the names of that party's candidates who have been duly nominated according to law, and by placing a cross in that party square the voter adopts all those nominees, unless he erases their names. It covers the party nominees and no others. 'He may place such mark within the square above the name of the party group or ticket, in which case he shall be deemed to have voted for all the persons named in the group under such party or designation,' are the words of the statute. The persons named in the group are the regular nominees of that party and none other. I can find in the statute no authority for this method of voting. These ballots cannot be counted for Woodside because his name is erased. They cannot be counted for Frothingham because the substituted name is not crossed. Therefore the ballots in this group must be rejected."

Notwithstanding the interpretation of the statute above given, with reference to its application to the method employed by the voter to express his will in the ballots considered in Group 5, a majority of the court are of the opinion that the ballots in Group 5 should be counted for Frothingham.

"Group 6.                                    Total 5.

"No cross in either party square.  Woodside's name not crossed in small square at the right of his name, but cross appears in small square below, opposite blank space.

"I think these ballots should be counted.  An inspection of them shows that the evident intention of the voter was to cross Woodside's name.  They voted for many other candidates in the same way. . . . . The ballots in this group should be counted for Woodside."

"Group 7.                                    Total 6.

"Four of these ballots, Nos. 1, 2, 5 and 6, have a cross in the Republican party square, and without erasing Woodside's name in that group, the voter placed a cross in the square at the right of Frothingham's name in the Democratic party group.  If Frothingham's name had not been crossed the ballots would be counted for Woodside.  If Woodside's name had been erased the ballots would be counted for Frothingham.  As it is they cannot be counted for either, but must be rejected.

*     *     *     *     *     *     *     *

"Group 8.               Miscellaneous.           Total 11.

"These are so-called miscellaneous ballots, a question having arisen as to each.  I will consider them seriatim.

"No. 1.

"The cross in the Democratic party group is at the upper left hand corner, and partly within and partly without the square.  This may have been made by a feeble person or one with defective vision. I think it should be counted for Frothingham.

"No. 2.

"Here a cross was originally placed in the Republican party square and then was erased so far as possible.  A close inspection shows that it was not made by a stub of a pencil.  Evidently the voter first made the cross and then intending to vote for only a portion of the candidates in that group he erased the cross as well as he could and made a cross opposite the names of four of the candidates out of the twelve in that party group.  He used the individual method, but he did not cross Woodside's name.  This ballot is rejected.

"No. 3.

"Cross in Republican party square. Woodside's name erased. Frothingham's name written in the blank space below Woodside's and crossed. Frothingham's name as printed in the Democratic party group also crossed. This voter emphasized his choice, and this ballot should be counted for Frothingham.

"No. 4.

"Cross in Republican party square. Woodside's name erased. Cross against Frothingham's name in Democratic column, an original line drawn through Frothingham's name and then erased as far as possible. The smooch caused by the erasure is quite different from the mark through Woodside's name and the cross in the square, which were made doubtless by the same pencil. A magnifying glass reveals the original line through Frothingham's name, which line was erased as far as possible. This ballot I count for Frothingham.

"No. 5.

"Cross in lower part of Democratic party square, partly within and partly without the square. I count this ballot for Frothingham.

"No. 6.

"No cross in either party square, but a check mark (✔) opposite each name in the Democratic column. The statute requires a cross to be made, and the marking must be by the symbol specified by the statute. *Bartlett* v. *McIntyre*, 108 Maine, 167. This ballot must be rejected.

"No. 7.

"Cross slightly within but mostly without the Democratic party square.

"I do not see how I can lay down any arbitrary rule as to the proportion that shall be within the square in order to be valid, and I rule that if any portion is within the party square the ballot should be counted. This, therefore, counted for Frothingham.

"No. 8.

"No cross in either party square. Three crosses made by the voter; one in the square at the right of Frothingham's name and two others directly across his name. This was equivalent to a striking out or erasure of the name.

"This ballot is rejected.

"No. 9 and No. 10.

"Cross in Republican party column. Sticker of brown paper with name of W. O. Frothingham written upon it placed over Woodside's name.

"Under the Public Laws, 1917, chapter 306, 'Stickers shall not be counted unless used to fill a vacancy or correct an error in the printed ballot.' Neither contingency existed here. These ballots must therefore be rejected.

"No. 11.

"Cross in Republican party square. Woodside's name erased. In blank space beneath was written 'William O. Frotham,' and not crossed. This ballot must be rejected . . . . 'Frotham' cannot be counted for 'Frothingham.'

"Group 9.    Distinguishing marks.                    Total 10.

"The rules established in this State as to what shall be deemed a distinguishing mark such as to invalidate a ballot have undergone much liberalization in order that the honest intent of the voter may not be thwarted. 'A ballot should not be rejected on the ground of fraudulent marking when its appearance is consistent with any honest action or intention of the voter. The burden to show fraud is on the one that claims it. Doubts should be resolved in favor of the voter, unless the fraudulent purpose clearly appears.' *Murray* v. *Waite*, 113 Maine, 485. And yet marks of every sort and character cannot be allowed. If so, the secrecy of the Australian ballot and the avoidance of bribery at elections sought to be secured thereby would be circumvented. Purchasable voters could readily prove their agreed upon compensation. If names, words, initials or letters unauthorized by law are placed upon a ballot deliberately and designedly I think it is safe to say that ordinarily they are placed there for no honest purpose. Neither mistake, nor inadvertence, nor feeble sight has inspired them.

"It is obvious that the question of whether a given mark is or not distinguishing so as to invalidate the ballot is a question of fact and one upon which persons of equal intelligence, experience and learning may well and honestly differ.

"Taking up these ballots seriatim I hold as follows:

"No. 1.

"No cross in either party square, but the name of Woodside and of the candidate for County Attorney crossed in the Republican column.

"The alleged distinguishing mark is a capital 'R' with a period after it, placed in the Republican party square. I can see no excuse or reason for this, and I think this ballot should be rejected. It is similar to the ballot marked with 'Geo. H.' which was rejected in *Libby* v. *English*, 110 Maine at 457.

"No. 2.

"Cross in the Democratic party square, and below the cross the letters 'O. K.'

"For the same reason I reject this ballot.

"No. 3.

"Cross in the Democratic party square and the word 'Pittengill,' evidently intended for 'Pattangall' the Democratic candidate for Governor, written in the square below the cross.

"I regard this as a distinguishing mark and reject this ballot for the same reason as Nos. 1 and 2.

"No. 4.

"Cross in Republican party square. Name of Woodside erased in that column and a cross placed in the square opposite Frothingham's name in the Democratic column. Opposite that small square, close to it and in the margin is a cross covered by a circle, like this ⊕ . This is readily to be explained. The voter undoubtedly by mistake or indvertence first placed his cross opposite Frothingham's name but outside the column, and seeing his error remedied it by striking out the cross with the circle and then placed his cross within the small square.

"I see no evidence of fraudulent intent here, and count this ballot for Frothingham.

"No. 5.

"Cross in Republican party square, and a lead pencil mark of cancellation drawn vertically down through the entire Republican column. The voter thereby struck out the names of all the candidates and this ballot is rejected, but not on the ground of distinguishing mark.

"No. 6.

"Individual crosses in the Democratic column, and on the margin in lead pencil are written the words, 'I vote for F. L. Edwards.' Edwards was a candidate for Representative to the Legislature.

"This ballot I reject on the same grounds as Nos. 1, 2 and 3.

"No. 7.

"No cross in either party square, but the individual names crossed in the Democratic column and the word 'Straight' written in the Democratic party square.

"I reject this ballot on the same grounds:

"No. 8.

"An irregular cross in the Republican party square, something like a double cross.

"I see no evidence of fraudulent purpose. I count this ballot for Woodside.

"No. 9.

"An irregular mark in the Republican party square, resembling somewhat an algebraic cross and somewhat the letter 2. I do not think this is a distinguishing mark, and as there is a cross in the small square opposite Woodside's name, this ballot is counted for him.

"No. 10.

"A cross in the Republican party square with a single horizontal line made across it. Under the rules already given I count this ballot for Woodside.

In accordance with the opinion of a majority of the court, the summary is now as follows:

1. Ballots rejected.

| | |
|---|---:|
| Group 2 | 7 |
| "  7 | 6 |
| "  8, Nos. 2, 6, 8, 9, 10, 11 | 6 |
| "  9, Nos. 1, 2, 3, 5, 6, 7 | 6 |
| Total rejected | 25 |

Ballots counted.

2. For William O. Frothingham, Petitioner,

| | |
|---|---:|
| Undisputed ballots | 4968 |

Of the disputed ballots:

| | | |
|---|---|---:|
| From Group 3 | | 16 |
| " | " 4 | 10 |
| " | " 5 | 19 |
| " | " 8, Nos. 1, 3, 4, 5, 7 | 5 |
| " | " 9, No. 4 | 1 |
| | Total for Frothingham | 5019 |

3.   For Frank F. Woodside, Respondent,

. Undisputed ballots ........................................................... .   4987

Of the disputed ballots:

From Group   6...................................................................... .     5

      "        "      9, Nos. 8, 9, 10...................... .... ..................     3

Total for Woodside.............................................   4995

Plurality for Frothingham...........................................     24

It is therefore held that the petitioner, William O. Frothingham, having received a plurality of all the ballots cast for Sheriff of Oxford County at the State election held on September 11, 1922, was duly elected Sheriff of said County for the term beginning January 1, 1923, and is entitled by law to said office as now claimed by him.

*Appeal dismissed with costs.*

MORRILL, J.   I am unable to concur in the opinion of the majority of the court and the importance of the questions involved justifies, I think, a statement of my reasons for dissenting.

The Justice hearing the case in the first instance divided the disputed ballots into nine groups; ruling upon the questions raised as to each group, he found that the petitioner, Mr. Frothingham, received 5,000 ballots which should be counted, and the respondent, Mr. Woodside, received 4,995 such ballots, thus reversing the decision of the Governor and Council and giving a plurality for Mr. Frothing- ham of 5 ballots; in arriving at this conclusion the Justice rejected 44 ballots.

The majority opinion in the main adopts the opinion of the sitting Justice; but counts for Mr. Frothingham Group 5, consisting of 19 ballots, rejected by the sitting Justice, thus reducing the number of rejected ballots to 25, and giving Mr. Frothingham 5,019 ballots, and Mr. Woodside 4,995 ballots, a plurality for the former of 24.

I think that the sitting Justice was right in rejecting the 19 ballots of Group 5, although not for the reasons given by him.

Counsel for Mr. Woodside contend that the sitting Justice erred in rejecting the seven ballots included in Group 2, and in not counting them for the respondent.   In arriving at their result of 5,002 ballots

for Mr. Woodside, the Governor and Council evidently counted those seven ballots for him.    It will be noted that the majority of the court although rejecting the ballots of Group 2, do not adopt the reasons given by the sitting Justice for so doing, those reasons being in their opinion inconsistent with the reasons given for not counting the votes in Group 5.    The number of ballots in Group 2 (7) is not sufficient to change the result in any event, and the question involved need not be further discussed here.

I think, also, that the sitting Justice erred, as contended by counsel for Mr. Woodside, in counting for Mr. Frothingham the ballots of Group 3 (16 in number) and the ballots of Group 4 (10 in number), and that the ballots of both groups should be rejected; practically the same question is involved in the consideration of both groups.

The opinion gives Frothingham 5,019 votes including in that count the votes of Groups 3 (16), 4 (10), and 5 (19).

The opinion gives Woodside 4,995 votes.

If the votes of Groups 3 and 4 (26 in number) are improperly counted for Frothingham and should be rejected, his count will be 4,993 votes or two votes less than the number for Woodside.

If the votes of Group 5 (19 in number) were properly rejected by the sitting Justice, Frothingham's vote will be further reduced to 4,974 votes, or twenty-one votes less than the number counted for Woodside.

Thus the decision as to the ballots included in Groups 3 and 4 is controlling.

The ballots of Group 3 are thus described:

"No cross in either party square, but crosses made against individual names, mostly in the Republican column.    Woodside's name erased.    Frothingham's name written in in the blank space below Woodside's and a cross placed in the square opposite Frothingham's name so written in.    Frothingham's name not crossed in the Democratic column."

The ballots of Group 4 are thus described:

"Cross in Republican party square.    Woodside's name stricken out.    Frothingham's name written in blank space beneath Woodside's name and crossed in the blank space opposite Frothingham's name so written in."

Counsel for respondent contend that these ballots cannot be counted for Mr. Frothingham for the reason that his name was

printed upon the ballot as a candidate for Sheriff under the party designation, that the law does not authorize the counting of names written on the ballot below a name erased when the name of the person thus written is elsewhere printed upon the ballot as a candidate for the same office, and that electors desiring to vote for Mr. Frothingham after erasing Mr. Woodside's name in the party column, should have done so by placing a cross in the square opposite Mr. Frothingham's printed name.

In this contention I think that they are absolutely right. Precisely the same question arose in the Androscoggin County Election Cases in 1918; upon consideration the sitting Justice then made the following rulings upon the question here presented:

1. If the name of the candidate of the voter's choice appears printed upon the ballot, that name cannot be written in a blank space as a candidate for the same office; the voter must indicate his choice by a cross in the proper place.

2. If the voter places a cross in the square at the head of the party column and wishes to vote for some candidate in another party column, he must erase the name of the candidate for the particular office in his own party column, and mark the name of the candidate for that office in the other party column with a cross in the square at the right of the name.

3. The voter may erase any name printed in the party column, and in such case the ballot shall not be counted for the candidate whose name is erased.

When those cases were before the Law Court, those rulings were acquiesced in by the parties. 118 Maine, 102. I think that the law, and the rules which should govern the method of marking ballots, were correctly stated in that case, and that the present opinion does not fully give effect to the change in the manner of voting made by the legislation of 1917.

In all cases arising under the ballot law in force in this State since 1891, it must be considered settled that the Legislature has the right to prescribe the manner of marking the ballot, and that the voter must follow the prescribed mode of marking, if he wishes his vote to be counted. The voter's intention must be legally expressed. The statute, in this respect is mandatory. "The marking must be as the statute commands, in a particular place and with a particular emblem." *Bartlett* v. *McIntyre*, 108 Maine, 167. "Whatever else

he does, the voter must express his intention as the statute requires."
*Libby* v. *English*, 110 Maine, 455. This construction of the ballot
law is well understood and unquestioned; yet there is a persistent
tendency to disregard it, in yielding to the supposed intention of the
voter as distinguished from his intention legally expressed.

I think that it was clearly the intention of the Legislature in enact-
ing the legislation of 1917 (Chapter 296 and Chapter 306) to provide
a method of voting by the use of a cross whereby all writing upon the
official ballot, and changes by the use of "stickers," or otherwise,
would so far as possible be rendered unnecessary. It is evident that
the more simple the method, and the less writing or other change on
the face of the official ballot, the less opportunity will exist for the
use of distinguishing marks, and the less chance for dispute as to the
intention of the individual voter. To this end the Legislature
provided (Chapter 296) for a ballot with a square at the right of the
name of each candidate whose name appeared on the ballot, as well
as at the head of the party column, and for two optional methods of
marking the ballot (Chapter 306), one by the use of a cross in the
square at the head of the party column, with or without crosses in
the squares at the right of the names of the candidates in another
column; the other, by the use of crosses in the squares at the right
of the names of the candidates, without using a cross in the party
square. The only contingency which could not be provided for by
the use of a cross was the desire of a voter to cast his ballot for a person
whose name was not printed on the ballot as a candidate for the
office which the voter desired him to fill. To meet such a case the
Legislature provided a blank space in which the voter "may write
the name under the name of the candidate erased." This is the only
provision found in the law for writing upon the ballot.

To make its purpose more effective the Legislature prohibited the
use of "stickers" except when necessary to fill a vacancy or correct
an error.

To some extent the method adopted was similar to that provided
by the original Act of 1891, Chapter 102, Section 24, prior to the
Amendment of 1893, Chapter 267. Under the Act of 1893, as
amended by the Act of 1903 permitting the use of "stickers," (R. S.,
1903, Chap. 6, Sec. 24. R. S., 1916, Chap. 7, Sec. 16) the greatest
latitude was allowed voters to express their choice by making altera-
tions on the face of the official ballot, thus giving unlimited opportu-

nity for the use of distinguishing marks, rendering the counting of the ballots unreasonably burdensome, and increasing disputes as to the intention of the voter. The Legislature of 1917 aimed at allowing an equal latitude to the voter in expressing his choice by the use of the cross in the manner clearly pointed out in Chapter 306, by placing the cross "within the square above the name of the party group or ticket," or as an optional manner of voting, "if the voter shall desire to vote for any person or persons whose name or names are not printed as candidates in such party group or ticket," by erasing "any name or names which are printed therein and place a cross (X) in the square at the right of the name of the candidate of his choice in any other party group or ticket."

To effectively accomplish the results intended the method of voting adopted must necessarily be exclusive. It would be of little use to prohibit the use of "stickers," if the voter was at liberty to erase a name printed upon the ballot and below the name erased *write* the name of a candidate for the same office printed in another party column.

The opinion controverts this construction of Chapter 306 by reference to Chapter 296, approved on the same date as Chapter 306, and therefore to be construed with it. Chapter 296 relates to the preparation of the ballots; Chapter 306 prescribes the manner of marking and casting the ballot. Assuredly they are to be construed together, and when so construed in the light of the existing statute to be amended, support the construction here contended.

The opinion says:

"Chapter 296, amending the provision as to the preparation of ballots, after reenacting the clause as to the blank space below the names 'in which the voter may write the name of any person for whom he desires to vote as a candidate for such office,' adds these significant words which had not appeared before: 'At the right of each name and at the right of the blank space above provided for there shall be left a blank square in which the voter may make a mark.' ".

The clause last quoted is indeed significant; it is the only substantial change made in the section; the clause providing for a blank space to be left after the names of the candidates for each different office in which the voter might write the name of any person for whom he desires to vote as a candidate for such office, had been in

the statute relating to the preparation of ballots for many years; unless the "significant words" were added, there would be no direction in law for preparing a ballot, which the voter could mark with a cross at the right of the name of the candidate of his choice, as expressly provided in Chapter 306. Hence the provision for a blank square at the right of each name and at the right of the blank space was added to harmonize the two statutes and to authorize the printing of ballots which should conform to Chapter 306.

The opinion proceeds:

"For what purpose is the voter allowed to place his cross in this blank unless his ballot so marked is to be counted? The ballot in its amended form is an express invitation to insert any name below the name of the candidate erased and to cross it after it is written in."

The purpose for which the blank square is provided, and for which the voter is to place the cross therein, is obvious when the two sections are read together. The blank square was provided to enable the voter to mark his ballot with a cross; and he was allowed to place his cross in the blank square at the right in accordance with Chapter 306, and when so placed to have his vote counted; if he has not placed a cross in the square at the head of the party column, his vote will be counted without other action on his part; if he has placed a cross in the square at the head of the party column, he must erase from the party column the name of the candidate for whom he does not wish to vote; and if he wishes to vote for a candidate whose name is not on the ballot as a candidate for the particular office, he may write the name under the name of the candidate erased.

The ballot in the form prescribed *before* the amendment was an express invitation to insert any name below the name of the candidate erased, and had been so understood and acted upon since 1893. In the law of 1893, in force until the passage of Chapter 306 of the Laws of 1917, there was no provision for the use of a cross except at the head of the party column. The ticket was "split" by writing in the name desired, and since 1903 by the use of "stickers".

The ballot in its amended form when Chapters 296 and 306 are considered together, was an express invitation to use the squares at the right of the printed names for the purpose of marking the candidate's name with a cross, and to insert in the blank space below the erased name, and to mark with a cross, the name of any person for whom the voter may desire to vote, not printed on the ballot as a

candidate for such office. To construe Chapter 296 broadly as permitting the voter to write *any name* in the blank space is construing it without reference to Chapter 306 and its obvious purpose; such a construction defeats the prohibition against the use of "stickers" and recognizes as valid a poor substitute for the latter, in effect reverting to the practice existing before the use of "stickers" was authorized in 1903.

As so construed together the two statutes are harmonious; upon any other construction they are inconsistent, and the legislation of 1917 fails of its full purpose.

It follows that the ballots in Group 3 cannot be counted for either candidate; not for Woodside, because his name is erased; not for Frothingham, because by writing in the latter's name instead of marking it with a cross in the Democratic column, the voters failed to observe the statute and thus failed to legally express their intentions.

For the same reason, the ballots in Group 4 must be rejected. They cannot be counted for either candidate.

For the same reason the ballots in Group 5 were correctly rejected by the sitting Justice, but not for the reason given by him, and should not be counted for Mr. Frothingham, as the opinion counts them.

The ballots of Group 5 are thus described:

"Cross in Republican square. Woodside's name stricken out. Frothingham's name written in in blank space under Woodside's in Republican column. No cross in small square at right of Frothingham's written in name."

These ballots cannot be counted for Woodside because his name is erased, nor for Frothingham because his name, appearing printed in the Democratic column, is written into the Republican column. Again the voters have failed to legally express their intentions.

The result is, as above stated, that Mr. Woodside is shown to be elected Sheriff of Oxford County by a plurality of twenty-one votes.