**In the Matter of ABC-FEDERAL OIL & BURNER CO., Inc., Bankrupt.**

**Peltz Street Terminals, Inc., Claimant-Appellant.**

**No. 13274.**

United States Court of Appeals
Third Circuit.

Argued Jan. 12, 1961.

Decided April 7, 1961.

Rehearing Denied May 25, 1961.

Arthur Littleton, Philadelphia, Pa. (Abraham L. Shapiro, Norman C. Henss, Cohen, Shapiro, & Cohen, Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellant.

Robert K. Greenfield, Philadelphia, Pa. (Edward Greer, Sidney Chait, Folz, Bard, Kamsler, Goodis & Greenfield, Goff & Rubin, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and FORMAN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In this complex factual situation, two issues are presented for disposition. First, whether through the negotiations of the parties a binding contract was entered into, thereby giving the appellant a right to participate in the bankrupt's estate. Second, if no contract was proven, is the bankrupt's estate entitled to restitution of certain sums expended in contemplation of the alleged contract.

The referee after extended hearings, found that there was no evidence of an enforceable contract and disallowed appellant's claim. On the counterclaim for restitution, he held the trustee in bankruptcy could not assert it because of a lack of proof and because the parties were in pari delicto. The district court affirmed the finding that there was no contract, but allowed the trustee's claim for restitution.

The bankrupt, ABC-Federal Oil & Burner Co., Inc., (hereafter referred to as ABC) had a short but spectacular life. It came into being in February, 1956. In May, 1957, a petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. was filed and in December, 1957, ABC was adjudicated bankrupt.

The creation of ABC was largely the work of the promoter, Eugene Callis. Through his efforts, two independent companies, ABC Oil & Burner Co., Inc. (a Pennsylvania corporation) and Federal Oil Burner Co. (a Delaware corporation) were consolidated. Callis then installed one David Gilbert as Executive Vice President and Treasurer to take over active management of the new corporation, Gilbert's investment therein being $7,500. Soon afterwards the Board of Directors of ABC granted Gilbert power to negotiate a thruputting and blending contract [1] under the following resolution:

"Resolved: That the officers of the Company be and they are hereby authorized and empowered to conclude whatever throughput contract they deem advisable for the storage of product at the Peltz Street terminal at rates not to exceed those presently being paid by other tenants of the terminal."

It is at this point Stanley Jacobs, who controlled the claimant, Peltz Street Terminals, Inc. (hereafter referred to as Peltz) comes into the pattern. Again through the efforts of Callis, Jacobs became interested in purchasing control of CFM Terminal, Inc., which was for sale. Callis informed Jacobs that if he would purchase this terminal, ABC would make a thruputting contract with him.

On several occasions Jacobs, Callis and Gilbert went over proposed arrangements between the parties. It is out of these talks that appellant claims a binding contract arose. As primary support for this theory appellant relies upon the testimony of Callis, Gilbert and Jacobs, together with the following letter sent Jacobs by Gilbert:

"March 19, 1956

"Mr. Stanley B. Jacobs
"23rd and Walnut Streets
"Philadelphia 3, Pa.
"Dear Mr. Jacobs:

"On behalf of this company, should you be successful in concluding an arrangement of purchase of all or any part of the stock of CFM Terminals, Inc., 3000 Peltz Street, Philadelphia, Pa., we will:

"a. Enter into a 15-year lease for light oil and black oil throughput at an annual guaranteed yearly volume of 600,000 barrels; maximum light oil throughput to be

1. Thruputting is a specialized term used in the oil industry to describe a sequence of operations by which oil is brought to a terminal by barge, is unloaded into storage tanks and is dispensed as needed into tank trucks. The primary purpose of this is to buy in larger quantities at the reduced price. Blending is the process whereby different types of oil are blended to produce the specifications of another type of oil.

made available, 600,000 barrels per year, maximum 5 and 6 fuel oil throughput to be made available, 600,000 barrels per year. We will pay 7¢ a barrel for light oil and 8½¢ a barrel for heavy oil. The usual acceleration clause will apply from year to year throughout the period.

"b. To accomplish the aforesaid, we agree to:

"1. Cause Fisher Tank Company, Chester, Pa., to erect approximately 1,000,000 gallon tank capacity at a cost of $30,000.

"2. Cause Proportioneers, Inc., to supply approximately $12,000 of blending equipment.

"3. Cause Robert H. Snyder, Mapleshade, N. J., to furnish one steam generator with all piping and controls, equip the boiler house and hook up the necessary black oil suction and pipeline discharge, including pumps and all necessary connections to the new tanks, dock, loading rack, etc.

"4. Cause Nason and Cullen, general contractors, to erect fire moat, pump house, boiler house, office and loading rack.

"c. The aforementioned new facilities, in addition to the tanks, will cost approximately $75,000, 10% plus or minus. As Lessor, Stanley B. Jacobs or his nominee may substitute as general contractor for all of the aforementioned work except the tanks and blending equipment.

"d. In consideration of the execution of the 15-year storage agreement at the rentals indicated, ABC-Federal will pay for the aforementioned improvements as completed and deduct from the annual rentals due under the first five years of the agreement, approximately $15,000 per year.

"e. A condition of the 15-year throughput product lease requires Stanley B. Jacobs or CFM Terminals or their nominee to erect a one-story 10,000 square foot building, rail siding and tailgate delivery at an approximate cost of $75,000.

"f. ABC-Federal herewith agrees to execute a lease for the one-story building on behalf of itself or its nominee, for a period of 15 years, at an annual net rental of $12,000 per year.

"g. Stanley B. Jacobs, CFM Terminals or their nominee will pay to E. M. Callis, consultant, monthly, 1¢ per barrel on all products delivered throughout the life of the fifteen-year lease.

"Very truly yours,
"David Gilbert
"Executive Vice President
and Treasurer"

After receipt of this letter, Jacobs entered into an agreement to purchase the CFM Terminal Co., Inc. for $250,-000. In August, 1956, Jacobs bought the controlling interest in the Terminal and formed the claimant corporation.[2] Immediately following that, ABC began thruputting oil at the terminal and contracted for supplies and equipment for use in the erection of the blending plant. These latter agreements form the basis of the bankrupt's claim for restitution.

Subsequently, the attorneys for the bankrupt and Peltz began to discuss a formal written contract. However, after several attempted drafts, the negotiations were abandoned.

The crux of appellant's claim is that the drawing of a formal agreement was not necessary since the minds of the parties had met thereby establishing an oral contract. Appellee urges that there was no meeting of the minds and that since the preliminary dealings did not culminate in a written contract, no bind-

2. Jacobs owned 60% of the corporation stock and one of the former owners, Harry Marks, owned the balance.

ing obligations arose. In reviewing the facts, we note the comment by the referee who stated:

> "The testimony of Eugene M. Callis, who was convicted and imprisoned for false swearing in a bankruptcy matter in Baltimore, and that of his alter ego, David Gilbert, in the opinion of the Referee is so totally inconsistent, that it is not worthy of belief.

> "The testimony of Stanley Jacobs, in the opinion of the Referee, is only partially worthy of belief."

Certain fundamental principles are applicable. The basic rule as set forth in the Restatement of Contracts Section 26, provides:

> "Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions * * *."

Ascertainment of the intention of the parties is of course vitally important. If they did not *intend* to be bound until a formal document was executed, they will not be bound. However, if they at the time *intended* a binding contract, the fact that a formal document was to be subsequently signed will not prevent the oral agreement from having operative force. Smith v. Onyx and Chemical Company, 3 Cir., 1955, 218 F.2d 104, 108; Williston on Contracts §§ 28, 28A (3rd ed. 1957); Corbin on Contracts, § 30 (1950). In seeking out this intention, the early case of Mississippi & Dominion Steamship Co. v. Swift, 1894, 86 Me. 248, 29 A. 1063, 1067 has helpful criteria:

> "In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

In the case at bar the alleged contract is only enforceable if the parties have settled upon all the essential terms thereof. Onyx Oils and Resins, Inc. v. Moss, 1951, 367 Pa. 416, 420, 80 A.2d 815; Essner v. Shoemaker, 1958, 393 Pa. 422, 425, 143 A.2d 364; Upsal St. Realty Co. v. Rubin, 1937, 326 Pa. 327, 334, 192 A. 481. Jacobs, the majority stockholder of Peltz, testified that the letter to him from Gilbert contained all the terms of the alleged contract. One of these provisions is the thruputting lease. As to this, the evidence is uncontradicted that the lawyers were unable to draft a formal thruputting lease because the parties were in disagreement on several material items. They could not reach accord as to the provisions for overages and shortages, inspection and certification, fire insurance on the products and plant, rights of assignment, prior storage rights of another tenant and provisions regarding delay or breach resulting from acts of God, strikes or other causes. These disputed terms were not mere formalities or routine language, but material conditions in a specialized contract.[3] The subsequent efforts by the attorneys unmistakably indicate that they were the

[3] Appellant's citation of Emerman v. Baldwin, 1958, 186 Pa.Super. 561, 142 A. 2d 440, to sustain the proposition that these terms are not essential to the contract is inapposite. That decision involves a simple lease of land which in no way approaches the involvements of the alleged contract in the pending suit.

subject of differences and were left unresolved. The very nature of the undertaking itself, having in mind inter alia the amount of money involved, permits a legitimate inference that the parties did not intend to be bound until the formal contracts were drawn and agreed upon. Mississippi & Dominion Steamship Co. v. Swift, supra; Essner v. Shoemaker, supra. The referee correctly found:

"The letter of March 19, 1956, and the testimony of Walter Knecht, Esq., [attorney for ABC] clearly shows the parties contemplated the drawing of a formal thruput and blending plant agreement, but were never able to agree to terms and consequently no contract was entered into * * *."

Other provisions of the letter go far to discount appellant's assertion that there was a present contract. Paragraphs "e" and "f" read:

"e. *A condition of the 15-year throughput product lease* requires Stanley B. Jacobs or CFM Terminals or their nominee to erect a one-story, 10,000 square foot building, rail siding and tailgate delivery at an approximate cost of $75,000.

"f. ABC-Federal herewith agrees to execute a lease for the one-story building on behalf of itself or its nominee, for a period of 15 years, at an annual net rental of $12,000 per year." (Emphasis supplied.)

In support of its contention that the parties considered themselves under a valid contract Peltz urges the purchase by Jacobs of the terminal, that ABC bought some equipment, arranged for the building of certain facilities for the blending plant and started thruputting at the terminal. We are satisfied, however, that any possible favorable inference to appellant therefrom is completely refuted by the facts that the parties from then on were never able to work out a mutually acceptable thruputting contract, that the above-quoted lease condition calling for the erection of the stated building was never fulfilled and that no lease was ever entered into for the proposed building. The whole record strongly supports the referee's finding, sustained by the district court that there was no binding contract as contended by appellant.

In contemplation of the alleged contract, ABC had expended $52,224.45, and had incurred unpaid claims for terminal equipment in the amount of $41,205.41. The trustee filed a counterclaim for restitution of these amounts which were disallowed by the referee for two reasons. First, the referee stated:

"With respect to the counterclaim of the trustees in bankruptcy, this clearly cannot be sustained, basically because of the lack of proof. As stated previously, the testimony of David Gilbert is so full of inconsistencies and his dealings with his alter ego, Eugene M. Callis, so questionable that it is not worthy of belief."[4]

Secondly, the referee concluded that since both parties were in pari delicto, they should be left " * * * in position in which they have placed themselves." The district court allowed the counterclaim applying the Restatement of Restitution, Section 53, which provides:

"(1) A person who has rendered service to another or service which

4. It is difficult to discern what the referee meant in denying the claim for "lack of proof". If his reason was that there was no evidence as to the expenditures and incurred debts of the bankrupt, he was in error, since independent documentary evidence in the form of a trustee's exhibit of the amounts of the claim was before him. And the record reveals that although the propriety of granting restitution was contested, the amount of the claim was not substantially disputed by Peltz. If on the other hand, the referee meant that the testimony of Gilbert and Callis were not worthy of belief, it was irrelevant on this issue, i. e. proof of the amount of the claim.

inures to the other's benefit or who has affixed chattels to the land or has improved the chattels of another, is entitled to restitution therefor if the services were rendered, or the chattels affixed, or the improvements made:

\* \* \* \* \* \*

"(b) to obtain the performance of an agreement made with the other therefor, not operative as a contract, or voidable as a contract and avoided by the other party after the services were rendered, the transferor erroneously believing because of a mistake of law that the agreement bound the other \* \* \*."

We think the district court's conclusion is correct. There is no proof of unfair dealings on the part of ABC, acting either through Gilbert or Callis with relation to Jacobs or Peltz. The action taken by ABC was pursuant to the alleged contract. It agreed to erect a tank; it ordered blending equipment; it had a steam generator and other equipment installed in the blending plant; and it had a moat, pump house and other facilities built. *All these improvements were made on the Peltz Street Terminal property, attached to it, and constitute the basis of the trustee's counterclaim.* Prima facie restitution should be decreed.

The dealings of Callis in these transactions do not preclude the trustee's right of recovery. The evidence is that Callis was motivated solely by his own interest which was unrelated to ABC. In paragraph "g" of the alleged contract it was provided that:

"g. Stanley B. Jacobs, CFM Terminals or their nominee will pay to E. M. Callis, consultant, monthly, 1¢ per barrel on all products delivered throughout the life of the fifteen-year lease."

Additionally, as part of the transaction, the wholesale oil business of the CFM Terminal, Inc., (Peltz' predecessor) was turned over to the Valley Oil Co., a company in which Callis was a partner.

The same Valley Oil was given the right to handle all of ABC's wholesale oil business under an agency agreement. Callis was to be allowed a consultant fee from ABC in the amount of $10,000. He received consultant fees from Peltz Street Terminal and an option to purchase the stock of Jacobs in Peltz in the event Jacobs desired to sell. There is testimony of a $12,000 loan to ABC from a Mr. Goodman, which gave Callis an option to purchase 50% of Gilbert's stock already issued, together with 50% of the originally unissued stock handed Gilbert as part of this arrangement.

Although the propriety of these actions and the other manipulations by Callis are subject to question, they in no way relate to ABC or his function as an agent of ABC. If anything, they show a disregard of his duty to that corporation. They cannot be imputed to ABC to bar the trustee's right of recovery. Cf. Todd v. Skelly, 1956, 384 Pa. 423, 429, 120 A. 906; Byrne v. Dennis, 1931, 303 Pa. 72, 77, 154 A. 123; Gunster v. Scranton, 1897, 181 Pa. 327, 337–338, 37 A. 550.

Mention should be made of the position of Jacobs and Peltz in these matters. As to the alleged contract, its terms were highly favorable to Peltz and in turn to Jacobs, the controlling stockholder. By it, the bankrupt was to construct the various facilities on the Peltz property the costs of which were to be paid back by Peltz under a thruput credit; the bankrupt was to receive no security interest in the facilities and no interest on the advance of the money. Jacobs, under a separate agreement with Callis was to have two-thirds of the one cent a barrel Callis was to obtain under the alleged contract.

We think the district court properly concluded that the trustee in bankruptcy was entitled to the claim for restitution.

We have examined appellant's other assertions of error and find them to be without merit.

The judgment of the district court will be affirmed.