**Harry POLISH, Trustee in Bankruptcy of Edward F. Dougherty, trading as Penn Plumbing & Heating Co., Bankrupt**

v.

**JOHNSON'S SERVICE COMPANY (a corporation).**

**Civ. A. No. 25593.**

United States District Court
E. D. Pennsylvania.

March 13, 1963.

See also 173 F.Supp. 776.

Paul Shalita, Philadelphia, Pa., for plaintiff.

M. E. Maurer, and Raymond L. Shapiro, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case, brought by the Trustee in Bankruptcy of a plumbing and heating contractor against a subcontractor who had contracted with such plumbing and heating contractor to install temperature controls in a high school building, was tried to the court on February 26, 27 and 28, 1963. The Trustee claims that such subcontractor received an overpayment, to part of which the Trustee is entitled, in securing from the owner the full amount owed to such subcontractor by the bankrupt at the time of the adjudication in bankruptcy.

On December 5, 1955, the bankrupt contracted (P–8) with "HIS EXCELLENCY, MOST REVEREND JOHN F.

O'HARA, C.S.C., Archbishop of Philadelphia," to furnish and install all plumbing and heating work in a new high school for the Roman Catholic Archdiocese of Philadelphia, to be known as Monsignor Bonner High School, and to be built in Drexel Hill, Upper Darby, Delaware County, Pa. The high school was to be built on real estate owned by the Roman Catholic Archdiocese of Philadelphia (hereinafter referred to as "Archdiocese"). The above-mentioned contract of December 5, 1955, provided for a consideration of $217,000. to be paid for the above-described plumbing and heating work. The following typewritten Article XIX appears at the end of the printed form of contract used in preparing the contract of December 5, 1955 (P–8):

"Owner accepts an alternate proposal suggested by Contractor whereby Johnson Service Pneumatic controls are used instead of Minneapolis Electric controls at a deduction in cost of $5,500.00."

Certain parts of the work to be done under the above contract of December 5, 1955 (P–8) were subcontracted by the bankrupt, including the installation of a temperature regulation system. The contract for this system was entered into with Johnson Service Company (a Wisconsin corporation), defendant, with the understanding that the "valves, dampers, pan and grid humidifiers furnished * * shall be installed by others free of expense to" the defendant (D–3). This temperature regulation system, together with necessary electrical wiring, was to be installed for a price of $6,000.

On or about August 9, 1957, the bankrupt, being in a precarious financial condition, stopped work on the job site in Upper Darby. A few days subsequent to that date, defendant wrote a letter dated August 9, 1957, to the Archdiocese, with copies to the attorneys for the Archdiocese, the bankrupt, the architect, the surety company on the performance bond of the bankrupt, and others. This letter (P–2) enclosed a statement showing that, although bills for progress payments had been submitted by the defendant to the bankrupt in the total amount of $5,292. on or before August 6, 1957, only $1638. (representing the first bill submitted in May of 1956) had been paid, leaving a balance due of $3,654. The letter contained this wording, among others:

"We wish to advise you as indicated upon our statement these items run back as far as June 1956 and our terms of payment are 30 days net. We also wish to advise you that under our company policy we cannot complete this job until payment is received or guarantee of payment made by your organization.

"We would appreciate your cooperation in this matter by forwarding necessary remittance or remittance from Penn Plumbing & Heating Company or guarantee of payment from the Archdiocese of Philadelphia for the stipulated amount.

"We wish to reiterate that our company policy prohibits finishing contract work on which payments are not received."

The Archdiocese answered the above letter from defendant dated August 9, 1957, by a letter of August 16, 1957 (P–3), stating " * * * we could not make payment to you * * * without an assignment from" the bankrupt. "Our performance bond guarantees completion only. Under the circumstances, we cannot comply with your request." On August 21, 1957, the defendant wrote the bankrupt (P–4), saying:

" * * * we are therefore looking directly to your company for payment of this amount due or as stated above we do not wish to inconvenience anyone concerned, but request that necessary arrangements be made for payment upon this contract."

On August 30, 1957, the bankrupt filed a voluntary petition in bankruptcy in this court (Cause No. 25148) and was adjudicated a bankrupt on the same day.

Shortly after receipt of the letter of August 9 (about August 14), Sabin and Company (a plumbing and heating contractor) was consulted by the Archdiocese and asked to complete installation of the temperature controls in the Bonner High School. At that time, the contract (D–3) undertaken by the defendant had been completed to the point of installing the pipe heads in the walls of the 18 rooms of the high school where thermostats were to be located. The thermostats had not yet been installed. Sabin and Company reported to the Archdiocese that the thermostats which could be fitted on the pipe heads already installed were only available from the defendant and the cost of removing the 18 pipe heads, installing pipe heads usable with other thermostats, and the procurement of thermostats from a competitor of defendant would be substantial.[1]

A conference called by the Archdiocese was held on September 13, 1957, at which representatives of the architects, Sabin and Company, defendant, and of the Archdiocese (including the attorney for the Archdiocese), among others, were present. At this meeting, the representatives of the defendant again emphasized that the policy of their company prevented them from doing any further work on the high school building unless the balance due under the contract by the bankrupt and the defendant was guaranteed by the Archdiocese or paid. At this conference, the urgency of completion of the temperature control system in the high school was discussed by those present.[2]

It was clear to those present, including the representatives of the defendant, that the Archdiocese would have to have the work completed almost immediately due to the possibility of cold weather in late September or early October. It was also made clear at this meeting that even if an alternative thermostatic control and pipe head for such alternative control were installed, there was a possibility that other parts of the heating system already installed under defendant's supervision might not work. Defendant gave a one-year free service contract on all jobs completed, but it would not give such free service if the pipe head and thermostat of a competitor were installed. There was no assurance that any competitor would give a guarantee or service contract if its pipe head and thermostat control were installed in the system designed for defendant's product, even though it was quite possible that the system would work with an alternative pipe head and thermostat.

On October 7, 1957, there was another meeting at the offices of the Archdiocese, at which the representatives of Sabin and Company reported that they could not do any further work on the heating system until the thermostats were installed. The architect recommended that these thermostats be procured from the defendant. Under these circumstances, the attorneys for the Archdiocese were authorized to prepare a writing, to be executed by the defendant, which would recite the circumstances under which the Archdiocese should guarantee payment of the amount

1. The representatives of defendant testified that this cost would be $1800. (not including the cost of opening up the walls for an 18-inch distance, which openings would be required in each of the 18 rooms in order to remove the pipe heads and install pipe heads usable with thermostats supplied by a competitor of defendant). No testimony was presented as to the exact cost of making such openings in the 18 rooms and of closing and repainting such openings after the new pipe heads were installed, since defendant's witnesses, although recognizing that a definite item of cost would be involved in such work, were not in a position to esti-

mate its cost. A representative of the Archdiocese testified that he was advised that the total cost of using a thermostatic control of a company other than defendant would be over $10,000.

2. The Archdiocese had opened this high school in September 1957 for the education of 3,000 boys and had made physical changes in the high school building, formerly used by these students, so that it could accommodate girls. Under these circumstances, there was no other building available for these 3,000 boys if the Bonner High School would not be available once the cold weather started.

owed to the defendant by the bankrupt under the contract marked D–3. This writing was forwarded to the defendant with a letter of October 8, 1957, from the attorney for the Archdiocese, which letter contained this language (P–5):

"The work which you have not yet completed makes it impossible for the Archdiocese to use the heating system in parts of Msgr. Bonner High School and, for that reason, it becomes necessary for the Archdiocese of Philadelphia to guarantee payment of your balance (?) of $5,292.00 composed as above, in order to protect the health and safety of the students at Msgr. Bonner High School. I am authorized to state that payment of the amount of $4,362.00 will be made to you upon completion of the work which you agreed to do for Penn Plumbing & Heating Co. at Msgr. Bonner High School and upon the issuance of an architect's certificate authorizing payment. It will be appreciated if you will sign the enclosed statement to the Archdiocese of Philadelphia so that the nature of this undertaking may be reduced to writing."

The writing or statement enclosed with the letter of October 8 was signed by the authorized representatives of defendant on October 10, 1957, and contained this language (P–7):

"The undersigned, at that time and prior to that time, refused, and still refuses to complete said work in the amount of Seven Hundred Eight Dollars ($708.00) unless it is paid not only for the work to be completed, but also for the completed work for which payment had not been received.

"In order to obtain completion of said work on its building, the Owner, Archdiocese of Philadelphia, has agreed to pay the undersigned Three Thousand Six Hundred Fifty-four Dollars ($3,654.00) for work previously completed and for which PENN did not pay the undersigned and Seven Hundred Eight Dollars ($708.00) to complete work not, as of October 1, 1957, completed. In consideration of such payment by the Archdiocese of Philadelphia the undersigned agrees to:

"1. Execute any writings which may be required of undersigned by Archdiocese to assist it in prosecuting any claim which it may have against any other party or parties for total or partial reimbursement of any monies paid by the Archdiocese of Philadelphia hereunder to undersigned.

"2. Pay over to the Archdiocese of Philadelphia any monies which it may receive from any other source on account of the work for which the Archdiocese of Philadelphia is making payment hereunder."

The above-mentioned writing executed on October 10 was returned to the attorney for the Archdiocese with defendant's letter of October 10, 1957 (P–6), stating that defendant was "completing the necessary work at the high school" since they accepted the guarantee of payment by the Archdiocese. No survey was ever undertaken by defendant to determine the value of the work still to be done under the subcontract (D–3) on August 9, 1957, and the estimated bills sent out by the defendant prior to that month were not indicative of the value of the uncompleted work and materials.

The work was completed by the defendant and, in January 1958 the Archdiocese paid the defendant in accordance with its guarantee (P–7 and P–8), both the $3654. billed and unpaid in August 1957 and the $708. which admittedly did not become due to defendant until the work was completed during the month following October 8, 1957. In November 1957, these amounts were paid to defendant out of a segregated account, where the Archdiocese kept funds allocated for payment of school construction and renovation costs, including the amount allocated for the payment of the unpaid amount

specified in its contract with the bankrupt (P–8).[3]

By ruling of September 19, 1958 (P–9), the above two amounts were allowed by the Referee in Bankruptcy as a set-off against the amount owed to the bankrupt by the Archdiocese under the contract of December 5, 1955 (P–8),[4] even though the Trustee in Bankruptcy objected to the allowance of the set-off of $3654., as opposed to the set-off of $708. The Trustee then instituted this suit to recover the $3654., less the pro rata distribution which is payable by the bankrupt on defendant's claim in this amount.

Assuming that defendant had the right to terminate its obligations under the contract (D–3) with the bankrupt in August 1957, in spite of its acquiescence in the bankrupt's consistent disregard of the 30-day payment requirement after submission of bills[5] and the lack of any evidence that defendant had even requested payment of amounts due under the contract until the bankrupt stopped work on August 9, 1957, the record makes clear that defendant never elected to terminate its obligations under the contract other than its obligation to make performance within a reasonable time. Its representatives wished to continue with the contract, but to have the Archdiocese guarantee payments due, and to become due, under its terms. Defendant never had a survey made of the value of the work to be performed and requested formation of a new contract providing for payment of such amount. The letter of October 8 states that payment of the exact amount due under the contract with the bankrupt (D–3) would be made.

■ Having made no election to terminate its obligations, defendant was still bound on its contract. Specialties Development Corp. v. C–O–Two Fire Equip. Co., 207 F.2d 753 (3rd Cir. 1953), cert. den. 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074 (1954); Gray v. Maryland Credit Finance Corporation, 148 Pa. Super. 71, 25 A.2d 104 (1942); In re Moore's Estate, 191 Pa. 600, 43 A. 474 (1899); Restatement, Contracts, § 309; Williston, Contracts, § 688. This being so, its refusal to perform unless the Archdiocese paid the bankrupt's debt was wrongful and constituted duress. Ordinarily, a threat to repudiate a contract, without more, is not duress. Vines v. General Outdoor Advertising Co., 171 F.2d 487, 490 (2nd Cir.1948), and cases cited therein. But, as here, the likelihood of irreparable injury and absence of adequate legal remedy, in that defendant's performance was needed to open the school on time, indicate that duress was present. Restatement, Contracts, § 493; Williston, Contracts, § 1620; see Vines v. General Outdoor Advertising Co., supra.

■ Under such circumstances, the defendant, in securing such full payment of a debt existing prior to bankruptcy from a fund allocated to payment of a debt due the bankrupt by the Archdiocese, when other creditors will only receive a pro rata distribution, received a void transfer prohibited by the terms of the bankruptcy laws and the cases interpreting these bankruptcy laws. See § 70, sub. e of Bankruptcy Act, 11 U.S.C.A. § 110, sub. e; 4 Collier on Bankruptcy, 14th Ed., §§ 70.71, 70.78; Eisenrod

3. On the other hand, the amounts paid to Sabin & Company for its work at the school and in advising defendant during August through October 1957 were paid by the surety on the performance bond, which covered completion of the work only. The Archdiocese has in no other situation paid a subcontractor of a bankrupt contractor an amount due prior to bankruptcy.

4. The Archdiocese paid the balance due of over $7000. to the Trustee in Bankruptcy after deduction of these and other set-offs in November 1958 (see first account of the Trustee, confirmed in January 1959—P–10).

5. The enclosure with the letter of August 9 (D–2) shows that as of that date three bills had been submitted to the bankrupt which were more than 30 days past due. One of these had been due for over a year and two others had been due for over seven months.

v. Utley, 211 F.2d 678, 680–681 (9th Cir. 1954); Warner v. Dworsky, 91 F.Supp. 884, 886 (D.Minn.1950), reversed 98 F.Supp. 466 (D.Minn.1951), reversed 194 F.2d 277, 280–281 (8th Cir. 1952); cf. In re ABC–Federal Oil & Burner Co., 182 F.Supp. 928, 936–937 (E.D.Pa.1960), aff'd. 290 F.2d 886 (3rd Cir.1961); First Bank of Marianna, Fla. v. Pinckney, 139 F.2d 575 (5th Cir.1944); In re Times Square Auto Supply Co., Inc., 47 F.2d 210, 212–213 (2nd Cir.1931).

As indicated by Judge Lord in the ABC–Federal case, supra, the plaintiff-trustee has a right of recovery in a case such as this under the principles of the Restatement of Restitution. Also, it is noted that there is diversity of citizenship between the parties in this case.

The following Requested Findings of Fact and Conclusions of Law are affirmed insofar as they are not inconsistent with the foregoing:

Plaintiff's Requests for Findings (Document No. 23) Nos. 1–11, 13–16, 17 modified to eliminate all words after the semi-colon, 18–22, 24 modified by deleting the word "several," 26, 27 modified by deleting "every" and adding an "s" to the word "method," and 28–36.

Plaintiff's Requests for Conclusions (Document No. 23) Nos. 1, 3, 4 and 5, as stated in letter of March 9, 1963, attached to plaintiff's Requests (Document No. 23).

Defendant's Requests for Findings (Document No. 22) Nos. 1–6, 7 modified to delete all words after the word "and" as well as that word, 8–11, 13 modified to substitute for "in due course" the words "on that date," 14–17, 18 deleting the second sentence, and 19–26.

Plaintiff shall submit an appropriate form of order, serving a copy on defendant, within a week and defendant shall have a week after such service to submit its comments on such proposed order.